**L. G. BALFOUR COMPANY, a corpora-
tion, and Burr, Patterson & Auld Com-
pany, a corporation, Petitioners,**

v.

**FEDERAL TRADE COMMISSION,**
Respondent.

No. 17236.

United States Court of Appeals,
Seventh Circuit.

April 5, 1971.

Edward F. Howrey, A. Duncan Whitaker, Gerald Kadish, Howrey, Simon, Baker & Murchison, Washington, D. C., for petitioners.

Thomas M. Clarke, Chicago, Ill., amicus curiae.

John V. Buffington, Gen. Counsel, J. B. Truly, Asst. Gen. Counsel, Miles J.

**6**

Brown, Atty., Federal Trade Commission, Washington, D. C., for respondent.

Before FAIRCHILD and KERNER, Circuit Judges, and STECKLER, Chief District Judge.*

KERNER, Circuit Judge.

This is a petition for review of an order and opinion issued by the respondent, Federal Trade Commission (Commission), in which it found petitioners, L. G. Balfour Company (Balfour) and Burr, Patterson & Auld Company (BPA), in violation of Section 5 of the Federal Trade Commission Act, 15 U.S. C. § 45.[1] After lengthy proceedings before a hearing examiner, the Commission concluded that petitioners had used unfair methods of competition in the national college fraternity insignia market and the national high school class ring market, and entered a comprehensive order which attempts to restore competitive conditions in these markets.

The complaint, issued by the Commission on June 16, 1961, charged petitioners with Section 5 violations in connection with the manufacturing, processing, sale and distribution of insignia-bearing fraternity products and high school class rings. The complaint alleged that Balfour and BPA had unreasonably foreclosed actual and potential competitors from access to the fraternity insignia and high school class ring product markets and had monopolized and attempted to monopolize these markets. More specifically, the complaint alleged that the petitioners had entered into exclusive dealing contracts with nearly all national Greek letter social and professional fraternities; had entered into exclusive supply contracts with suppliers of fraternity insignia-bearing goods; had policed and controlled the entry of competitors into the national fraternity insignia goods market through the offices of the Interfraternity Research and Advisory Council (IRAC); had disparaged competitors; had entered into exclusive dealing contracts with representatives of high schools and colleges in the sale of class rings; had acquired three competitors between 1927 and 1952; and had enticed and attempted to entice away employees from competitors. Such practices were alleged to unlawfully restrain, lessen and eliminate competition and create a monopoly to the prejudice of the public in violation of Section 5 of the Federal Trade Commission Act.

Hearings were commenced before an examiner in October, 1961, and completed in June, 1966. In November, 1963, petitioners filed suit in the District Court for the Eastern District of Virginia seeking to limit the evidence before the Commission to the ten-year period prior to the issuance of the administrative complaint. A consent order was reached which provided that "all oral and documentary evidence relating to events, transactions and business conduct occurring before June 16, 1951, be physically excised from the administrative record," except insofar as otherwise agreed upon by counsel, and that "the allegations of the administrative complaint * * * be limited to ten years prior to June 16, 1961."

At the conclusion of the hearings in 1966, the examiner filed his findings and decision. He concluded that the petitioners had monopolized and utilized unfair methods of competition in the national college fraternity insignia goods market. He also found there was insufficient evidence on which to sustain the charge that petitioners monopolized or utilized any other unfair methods of

---

* The Honorable William E. Steckler, Chief Judge of the United States District Court for the Southern District of Indiana, is sitting by designation.

1. Section 5(a)(1) provides: "Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are hereby declared unlawful."

Section 5(a)(6) provides: "The Commission is hereby empowered and directed to prevent persons, partnerships, or corporations * * * from using unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce."

competition in the college and high school class ring market. On appeal to the Commission, the examiner's findings with respect to the national college fraternity insignia goods market were affirmed. The Commission, however, reversed the examiner's dismissal of charges in the class ring market, and held that Balfour's use of term purchase agreements with high schools in this market were exclusive dealing contracts which violated Section 5. Based upon these findings and consequent Section 5 violations, the Commission issued its detailed order from which the petitioners appeal.

Balfour and BPA launch extensive attacks upon the Commission's findings of fact, conclusions of law, and scope and content of its order as well as claims of prejudicial procedural irregularity during the hearing. We are aided in the disposition of this appeal by *amicus curiae* briefs and statements filed on behalf of several national fraternal organizations. We note at the outset that the scope of this review is twofold. We must determine if the Commission applied incorrect legal standards which prejudiced its findings against petitioners. We must also determine whether the administrative decision is supported by substantial evidence in the hearing record before the examiner. Consolo v. Federal Maritime Commission, 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966); National Dairy Products Corporation v. F.T.C., 412 F.2d 605, 620 (7th Cir. 1969).

## NATIONAL COLLEGE FRATERNITY PRODUCTS

Balfour, a Massachusetts corporation, is engaged in the manufacturing, distribution and sale of organizational insignia jewelry and other products bearing organizational insignia. Its purchasers include college fraternities, professional, honorary and other social organizations, as well as high schools and colleges. Its total sales in 1960 were $22 million. Of that, approximately $7 million were attributable to the sales of its Fraternity Division. The sales to national college fraternities from that division were $5.3 million in 1960. The Class Ring Division accounted for $11 million in sales to high schools and colleges. The Commercial Division realized $2.6 million for sales of jewelry to commercial organizations and $1.5 million for sales of jewelry to non-college fraternal organizations and clubs. Balfour's subsidiary, BPA, totalled $1.3 million in 1960 for sales of fraternity insignia-bearing products.

The Fraternity Division sells both jewelry products, such as fraternity pins, and other insignia-bearing fraternity products, such as paddles, beer mugs, party favors and pennants. Each buyer fraternity has its own distinctive insignia and crest. The major buyers of Balfour's fraternity division products are national college fraternities, each of which possesses distinctive insignia composed of the two or three Greek letters which comprise its name. Approximately a third of the national college fraternities have registered their insignia under the Lanham Trade-Mark Act, 15 U.S.C. § 1114 et seq., but most have not sought statutory trademark protection.

At least 90% of the fraternity chapters on college campuses are governed by a national organization. Ultimate authority for decisions binding on all local chapters rests in the fraternity convention, held once every year or two years. Between conventions, decisions are made by the national executive committees of the fraternities. All have constitutions or by-laws which are binding on the local chapters. Most of these national college fraternities are members of one of five nationally organized interfraternity conferences.

The five interfraternity organizations are members of the Interfraternity Research and Advisory Council (IRAC). In 1960, 140 national college fraternity organizations were members of the IRAC. The IRAC was organized, financed, and for a period of years, directed by Lloyd Balfour, who has a con-

trolling interest in both Balfour and BPA.

Balfour and BPA sell their fraternity insignia-bearing products under exclusive dealing contracts executed with the various national .fraternities. These exclusive dealing contracts, referred to as official jeweler contracts, designate the petitioners as the sole official jeweler, co-official jeweler or official jeweler of the fraternity, and name them as the exclusive supplier of insignia-bearing items of the fraternity. The national fraternities' by-laws or constitutions generally provide that the local chapters buy only from the seller designated as the official jeweler. No other competing seller of insignia goods may send a salesman to the local chapters for solicitation. The contracts also set certain standards for design and quality. They are of indefinite duration, terminable upon either six months or one year's notice.

The IRAC has endorsed these exclusive official jeweler contracts and has frequently warned against unauthorized sales by fraternal insignia goods suppliers. A vast majority of the national college fraternities who are members of the IRAC have official jeweler contracts with either Balfour or BPA. Balfour and BPA had in 1960 official jeweler contracts with 279 of 288 fraternities listed in an authoritative fraternity register.

The Commission found that Balfour and BPA controlled 86.9% of the national college fraternity insignia goods market. The remaining 13.1% sales in this market was shared by approximately 36 competitors. The Commission concluded that the petitioners' monopolistic share of the market enabled them to set prices uncontrolled by the competitive conditions which would exist in a free market and enabled them to exclude actual and potential competitors from the market.

Numerous instances of monopolistic conduct were found by the Commission. The official jeweler contracts were found to be an unfair method of compe-

tition, used by the petitioners to perpetuate their enormous share and control of the market. Other activities found violative of Section 5 include the following:

(1) Petitioners falsely represented that almost all national college fraternity insignias were protected by statutory trademark registration.

(2) Petitioners operated the IRAC for their own benefit while cloaking it with the appearance of an impartial and respectable third party.

(3) Petitioners used the IRAC to police the market by informing fraternities and competitor-suppliers that sales to fraternities by suppliers not designated as official jewelers were unauthorized because of the trademark status of the fraternal insignia.

(4) Petitioners disparaged the quality of their competitors' goods and their business practices and referred to them as "pirates."

(5) Petitioners utilized exclusive contracts with those who supplied them with insignia products.

(6) Petitioners hired some of its competitors' employees.

(7) Balfour secretly acquired and operated BPA as its subsidiary while giving the appearance that BPA was a competitor.

These activities by Balfour and BPA were found to be unfair methods of competition rather than the result of inevitable economic factors, and to constitute monopolization within the meaning of Section 5 of the Federal Trade Commission Act.

Section 5 of the Federal Trade Commission Act offers a general prohibition against "unfair methods of competition" and does not, as the Sherman and Clayton Acts do, list the specific acts and practices which would amount to a Section 5 violation. The Commission, however, is empowered to use Section 5 to prohibit practices and remedy conditions in monopolistic or oligopolistic markets which " * * * [run] counter to the public policy declared in the Sherman

and Clayton Acts * * *." Fashion Originators' Guild v. Federal Trade Commission, 312 U.S. 457, 463, 61 S.Ct. 703, 706, 85 L.Ed. 949 (1941). See Federal Trade Commission v. Motion Picture Adv. Service Co., 344 U.S. 392, 394–395, 73 S.Ct. 361, 97 L.Ed. 426 (1952); F.T.C. v. Beech-Nut Packing Co., 257 U.S. 441, 453–455, 42 S.Ct. 150, 66 L.Ed. 307 (1922); Rader v. Balfour, 440 F.2d 469 (7th Cir., Mar. 22, 1971).

With this broad standard in mind, the Commission determined that Balfour's monopolization of the national college fraternity insignia-bearing goods market violated Section 5. Section 2 of the Sherman Act, 15 U.S.C. § 2, makes monopolization illegal. Our review, then, is based on an examination of criteria which constitute an offense under Section 2 of the Sherman Act. We understand that facts amounting to a Section 5 violation of monopolization should be sustained if they contravene the policies of Section 2, though they might not constitute a violation of Section 2 itself. See Rader v. Balfour, *supra*.

The Supreme Court in United States v. Grinnell Corp., 384 U.S. 563, 570–571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966), outlined the elements of Section 2 as:

> (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acûmen, or historic accident.

Petitioners contend that the Commission misapplied the law in defining the relevant market as the national college fraternity insignia-bearing goods market, and that there is insufficient evidence to support the finding that petitioner held a monopolistic share of the market. In addition, petitioners assert that none of their activities in the market—from their use of the official jeweler contracts to their manipulation of the IRAC and Balfour's secret operation of BPA —constitute conduct amounting to monopolization.[2]

1. *The Relevant Market.*

The Commission determined that national college fraternity insignia-bearing goods constituted the relevant market in this case. For this, it relied on the definition of submarkets, as stated in Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). The Commission said that "the relevant market for purposes of Section 7 [of the Clayton Act] must be determined by reference to:

> 'such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes and specialized vendors.' "

*Brown* at 325, 82 S.Ct. at 1524. See Reynolds Metals Co. v. F.T.C., 114 U.S.App.D.C. 2, 309 F.2d 223, 226–229 (1962). The Commission concluded, after an examination of the facts, that the relevant market was national college insignia-bearing goods:

> In the instant case competing jewelers testified that they considered national college fraternity jewelry as a separate and distinct sales market. Entry into this market would require a separate and unique sales and distribution system, additional production facilities and the training of specialized sales personnel. Furthermore, the national college fraternity system constitutes a unique and distinct class of purchasers whose interests are different from other organizations purchasing emblematic jewelry. The existence of several small firms, devoted solely to

---

2. Since we hold that there is substantial evidence that the various practices of petitioners in the national college fraternity goods market constitute monopolization under Section 5, we need not decide whether the acts themselves would violate Section 5 without a showing of monopoly power. See discussion *infra*.

the sale of insignia products to national college fraternities gives added support to the examiner's market definition. [Petitioners] themselves maintain a separate sales department, known as the Fraternity Division, limited to the sale of fraternity insignia products. This Division has its own organizational structure, sales bulletin and commission schedules and utilizes its own competitive methods which differ from the sales methods employed by [petitioners'] other product sales divisions.

[Reference to pages in record omitted.]

We do not agree with petitioners' argument that the geographic market should have included local, as well as national, college fraternities. The Commission based its market analysis on the relationship of the purchaser fraternities to the suppliers and the nature and organization of the fraternities themselves as that affects the suppliers' distribution and sales system. Also relevant to this market definition is the existence of the national organizational structure of the fraternities, inter-fraternities and the IRAC. The fact that the national fraternal organizations imposed the official jeweler contracts on their local chapter adds to the logic of considering the fraternity market a national one.[3]

Petitioners argue that the criteria of submarkets, taken out of context by the Commission from *Brown Shoe*, which involved a merger under Section 7 of the Clayton Act, 15 U.S.C. § 18, is inapplicable to a monopolization case. Rather, they urge that the relevant product market is determined by reference to the test which is stated in United States v. E. I. du Pont de Nemours & Co., 351 U. S. 377, 395, 76 S.Ct. 994, 100 L.Ed. 1264 (1956), a monopolization case. In *du Pont*, the Court explained the test to be used in Section 2 monopolization cases: " * * * no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce', monopolization of which may be illegal." *Id.* at 395, 76 S.Ct. at 1007. This test examines the cross-elasticity of demand by the purchasers, *i. e.*, if purchasers can substitute the products of one supplier with the products of other suppliers, then those suppliers constitute a market in a Section 2 monopolization case.

On the basis of this standard, petitioners claim that the delineation of a national fraternity market is erroneous since products bearing the insignia of one fraternity could not be substituted for products bearing the insignia of another fraternity. This is true. If, for example, the price of goods with Sigma Alpha Mu insignia were increased by the seller, a member of that fraternity could not purchase the goods with the insignia of another fraternity no matter how low the price would be. A member of one fraternity has no demand for the insignia-bearing products of another fraternity. Thus, the price of goods for one fraternity would be unaffected by the prices of goods for any other fraternity.

Yet, this would be true of any market where there is a substantial degree of product differentiation. If the elasticity of demand test were a required standard for market definition in every case, then

---

3. The hearing examiner found that:
 * * * in their communications (1) telling retail jewelers that fraternity insignia products are sold only through [petitioners], (2) policing competitors, (3) urging the fraternities to register their insignia as trademarks, (4) urging the fraternities to refuse to buy from [petitioners'] competitors, (5) disparaging competitors, (6) threatening competi-

tors with litigation, (7) urging fraternities to file complaints with the Federal Trade Commission against [petitioners'] competitors, and (8) telling [petitioners'] suppliers that they must sell only to [petitioners], [petitioners] make constant and continual references to the *national* college fraternities, but never to *local* college fraternities.

no market in which there were inelastic demand curves could be delineated. Such a result would preclude analysis of markets with inelastic demand and would deny the realities of the market situation. In this case, the petitioners would have us conclude that each national college fraternity should be considered a separate market, even though the evidence indicates that the sales and distribution systems of the sellers and the organization of the fraternities and interfraternities is on a national level. We believe that if the Commission utilized the elasticity of demand test strictly, there could be no sensible market analysis or market definition. While the use of the cross-elasticity of demand test has been cited with approval in monopoly cases, we believe that the Commission was not in error in rejecting its use in this case.

We believe, moreover, that the propriety of the standards of market definition used by the Commission is controlled by United States v. Grinnell Corp., *supra*, 384 U.S. at 572–573, 86 S. Ct. at 1704–1705, in which the Court said: " * * * in § 2 cases under the Sherman Act, as in § 7 cases under the Clayton Act [citing *Brown Shoe*] there may be submarkets that are separate economic entities. * * * We see no reason to differentiate between 'line' of commerce in the context of the Clayton Act and 'part' of commerce for purposes of the Sherman Act." [4] See Columbia Broadcasting System v. F.T.C., 414 F.2d 974 (7th Cir. 1969). Although the statements in *Grinnell* are dicta, no policies have been proffered by petitioners to show why the submarket analysis of Section 7 should not also be applicable to Section 2 cases. The ultimate objective of the criteria is to delineate markets which conform to areas of effective competition and to the realties of competitive practice. Further, the Commission under Section 5 is not bound to follow antitrust standards as strictly as the courts must in cases under the Sherman and Clayton Acts. See Fashion Originators' Guild v. F.T.C., 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941) ; see also, F.T.C. v. Brown Shoe Co., Inc., 384 U.S. 316, 86 S.Ct. 1501, 16 L.Ed.2d 587 (1966).

Petitioners, in the alternative, assert that the suppliers of all emblematic jewelry, rather than fraternity products, should be included in the product market. They base this claim on the crosselasticity of supply test which is an examination of the production flexibility of suppliers. As petitioners explain, a college fraternity could, if necessary, buy its goods from a manufacturer of any kind of emblematic jewelry—and not one producing merely insignia-bearing goods—since the manufacturer could easily convert its facilities designed for production of emblematic jewelry to production of insignia-bearing fraternity goods. This alternative source of supply test, however, has been rejected by the courts as the only standard to be used for definition of the market. See Crown Zellerbach Corp. v. F.T.C., 296 F.2d 800 (9th Cir. 1961). The D.C. Circuit in Reynolds Metals Co. v. F.T. C., 114 U.S.App.D.C. 2, 309 F.2d 223, (1962), looked to factors other than those dealing with the flexibility of supply. We agree with the court in United States v. Bethlehem Steel Corp., 168 F. Supp. 576 (S.D.N.Y.1958), that any test "which ignores the buyers and focuses on what the sellers do, or theoretically can do, is not meaningful." While these decisions concerned Section 7 of the Clayton Act, the discussion of the limitations of the cross-elasticity of supply test apply in shaping the standards for market definition in this monopoly case.

For the above reasons, we sustain the Commission's determination of the relevant market.

---

4. The Commission cited *Grinnell* in a footnote and stated that "[t]he law is clear that similar standards [of submarkets as defined in *Brown Shoe*] are applicable in defining relevant markets in a monopolization case."

## 2. *Petitioners' Share of the Market*

The Commission found that the petitioners had official jeweler-exclusive dealing contracts with over 90% of the national college fraternities, and the petitioners sold 86.9% of the market's goods in 1960. Petitioners accept the 90% figure, but assert that the latter figure, to which the Commission gave weight in holding that the petitioners possessed monopoly power, was not based on substantial evidence. The 86.9% figure was reached by the examiner by adding petitioners' total sales for 1960, $5.3 million, to the sales of their competitors that testified before the Commission, which amounted to $800,000. Total market sales, then, was determined to be $6.1 million, against which petitioners' sales of $5.3 million gave them 86.9%.

Petitioners contend that the Commission neglected to include the sales of twenty-six competitors that did not testify before the Commission. They assert that their market share was no greater than 33⅓% because two of their competitors, called as witnesses for the Commission, testified that annual sales in the market were between $15 and $18 million.

■■ Proof of a corporation's share of the market is generally used to show monopoly power, an element of the offense under Section 2 of the Sherman Act. United States v. Grinnell Corp., 384 U.S. 563, 571, 86 S.Ct. 1698, 16 L. Ed.2d 778 (1966). The share, expressed as a percentage, can be based on annual sales. It has been held that the shares probably must be greater than sixty percent. United States v. Aluminum Co. of America, 148 F.2d 416, 424 (2d Cir. 1945). A company with a substantial percentage share of a market would have the power to preclude entry and advancement and set prices without paying heed to those forces which would exist in a healthy and competitive market. United States v. Aluminum Co. of America, 148 F.2d 416, 424 (2d Cir. 1945). These are the "powers" which a monopo-list possesses and which the antitrust laws are designed to prohibit. There is no doubt that the record and findings before the hearing examiner establish that petitioners possessed this power and control in the national college fraternity goods market.

An undisputed and significant fact is that petitioners were the exclusive suppliers of over 90% of the national fraternities in the market. The hearing examiner found that of 288 fraternities listed in an authoritative register, petitioners were the exclusive dealer of 279. He also concluded that BPA was the exclusive jeweler for 14.5% of the fraternities, and 18% of them, including those contracts in which it was co-official jeweler with Balfour. Of 6,205,336 total fraternity members, petitioners had 6,115,440 under contract, or 98.6% of all membership. These figures indicate that petitioners have exclusive dealing contracts not only with substantially all of the national fraternity organizations, but also with nearly all members.

The standard provisions of the official jeweler contract give petitioners the right to supply the goods to the fraternity, and the fraternity agrees to use its "best endeavors" to have all its chapters and members buy from petitioners. And, as the hearing examiner found:

The fraternities, themselves, look upon these official jeweler contracts as authorizing only [Balfour and BPA] to manufacture, sell and distribute jewelry or other products which bear the fraternity's insignia. This is clear from documents written by the fraternity officials (1) refusing to permit any company to manufacture items for the fraternity and (2) warning or threatening any company or individual which does manufacture or display such items. Numerous such letters are in this record. An example of this type of letter is a letter from Alpha Xi Delta to a manufacturer of women's compacts and cigarette lighters that had requested permission to use the sorority's insignia

on such products for sale to Alpha Xi Delta members. The letter stated:

"We regret to say that the use of this emblem is restricted by the National Fraternity and use of it in any merchandise such as that described in your letter must be cleared through the official jeweler."

The fraternities regularly advise their chapters that they can only buy from the exclusive jeweler. Exhibits in the record of letters and announcements of the fraternities bear this out. Some fraternities have provisions in their constitutions and by-laws making the official jeweler contract a requirement on the local chapters. Threats of fines and expulsion, the hearing examiner found, "can result from making unauthorized purchases." Both the national fraternities and the petitioners have consistently warned against unauthorized sales not under the exclusive dealing contracts. The IRAC has been especially active in this area in its letters and announcements to local chapters and its encouragement of litigation against unauthorized suppliers.

We find no evidence that any significant number of the official jeweler contracts were not honored by the local chapters. In a letter written in 1960, Mr. Balfour said: "Never in the history of the L. G. Balfour Company have we ever had a contract cancelled. * * * " Because of the tremendous pressure put on the local chapters by the national fraternities, the IRAC and petitioners themselves, few unauthorized sales could take place.

This conclusion is buttressed by the fact that numerous sellers of fraternity goods were not given access to the fraternities and that, frequently, orders by the fraternities with them were cancelled after they were placed. It was extremely difficult for competitors to advertise their fraternity goods in the two publications with national circulation. Salesmen were, in many cases, barred from visiting local chapters. Because of the existence of these numerous official jeweler contracts with petitioners, only one competing firm has entered the fraternity jewelry market in the five years prior to the issuance of the complaint. Many competitors have ceased their attempts to cultivate the fraternity goods market because they believe Balfour has it "tied up."

Thus, the evidence eliminates the possibility that those chapters *not* buying under official jeweler contracts constituted a significant share of the market. The record also indicates that competitors were barred from effective competition because of these contracts. This, we believe, constitutes substantial evidence of monopoly power.

Further, petitioners were able to dictate the prices of goods they sold to their purchaser fraternities. When petitioners announced that they would raise the prices on their goods, "the fraternities," the examiner found, "accepted without question." The evidence shows them as unconcerned about the pricing policies of their competitors and the purchasing power of the fraternities. Representatives of Balfour testified that the determination of prices in the fraternity market is based on a flat figure determined by them, in comparison to its pricing policies in other markets where it depends upon the prices of competitors.

■ While we believe that it was error for the Commission to conclude that the petitioners controlled 86.9% of the market,[5] without evidence of the sales of all the firms in the market, we hold that petitioners' exclusive dealing contracts with over 90% of the fraternities supports a finding of monopoly power. The most effective proof, we admit, would be

---

5. The testimony of two witnesses that annual sales in the market were between $15 and $18 million was opinion evidence and could be discounted by the Commis-

sion. One of these witnesses admittedly had not been involved in this market in recent years, which militates against the accuracy of his testimony.

a total sales figure which included *all* competitors in the market. Absent this, however, the other evidence which revealed that the petitioners were under exclusive dealing contracts with nearly all of the national fraternities, satisfies us that petitioners possessed illegal monopoly power. The case before us, we repeat, is not a Section 2 monopolization case, but one under Section 5, a flexible and remedial law. See Rader v. Balfour, 440 F.2d 469 (7th Cir., March 22, 1971).

### 3. *Petitioners' Monopolistic Practices*

■ In addition to its finding of monopoly power, the Commission determined that petitioners engaged in a number of practices which proved their monopolistic intent. A company with a monopolistic share of the market must be shown to have conducted its business with the goals of building ahead of demand and taking the initiative in dealings with purchasers, suppliers and competitors. United States v. United Shoe Machinery Corp., 110 F.Supp. 295, 341 (D.Mass.1953); United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). The conduct itself need not amount to an unfair method of competition under Section 5 or constitute a violation under the Sherman and Clayton Acts.

The Commission found a number of practices which it concluded were monopolistic.

### A. *Official Jeweler Contracts*

Petitioners' accumulation and enforcement of official jeweler contracts—admittedly exclusive dealing contracts—were found to be anti-competitive and monopolistic. In its opinion, the Commission stated:

> The record clearly shows that the "official jeweler contracts" as used by [Balfour and BPA] were exclusive and, by [Balfour's and BPA's] own admission, anticompetitive. Without determining whether this type of contract would be illegal in some other context, we are of the opinion that in

the present factual situation, with the purpose, intent and competitive effects of these contracts, official jeweler contracts, as accumulated and enforced by [Balfour and BPA], are an unfair method of competition and violate Section 5.

The official jeweler contracts were found to be exclusive dealing arrangements of long term, indefinite duration, and their accumulation and use were anti-competitive.

Exclusive dealing contracts have been held to be illegal under Section 3 of the Clayton Act and Section 5 of the Federal Trade Commission Act if they have an anti-competitive effect on the market. See F. T. C. v. Brown Shoe Co., 384 U.S. 316, 86 S.Ct. 1501, 16 L.Ed.2d 587 (1966); Standard Oil Co. of California v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949). We do not, nor need we, decide whether the existence of these agreements themselves would violate Section 5 without a showing of monopoly power.

■ We simply hold that, in the context of proof of monopoly power, these contracts are anti-competitive and constitute an unfair method of competition under Section 5 as monopolization. These contracts are no less anti-competitive because some national fraternities do not make performance of them mandatory on their local chapters or forbid purchases from other local suppliers. The fact is that the overwhelming majority of local chapters honor the agreements and consider them binding. The anti-competitive effects of these exclusive contracts is not significantly weakened because they *may* be breached or disregarded by the local chapters. See our discussion, *infra*. See Atlantic Rfg. Co. v. F. T. C., 381 U.S. 357, 85 S.Ct. 1498, 14 L.Ed.2d 443 (1965).

Petitioners interpose several arguments justifying the use of exclusive official jeweler contracts. They assert that the fraternities' insignias are protected by trademark, and that the official jeweler contracts are designed to

maintain that protection. Also, they give several reasons showing that such contracts are necessary and advantageous to the fraternities.

There are admitted advantages to the fraternities that use the official jeweler contracts. Maintaining one exclusive jeweler for the national fraternity ensures uniformity in the design of the insignia and workmanship of all the insignia goods sold to the local chapters. Additionally, the fraternities can limit the number of salesmen visiting the local chapters and cut down on the paper work and time that would be necessary when dealing with more than one possible supplier.

Nonetheless, the accumulation and enforcement of official jeweler contracts does not become lawful because it benefits some fraternities. While it is relevant to consider the advantages of a trade practice on individual companies in the market, this cannot excuse an otherwise illegal business practice. F. T. C. v. Motion Picture Adv. Serv. Co., Inc., 344 U.S. 392, 73 S.Ct. 361, 97 L.Ed. 426 (1953). Congress has embodied in the antitrust laws the theory that the long run advantage of the economic community depends upon the removal of restraints upon competition. United States v. Aluminum Co. of America, 148 F.2d 416 (2d Cir. 1945); Standard Oil Co. of California v. United States, 337 U.S. 293, 309, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949).

No business necessity can justify petitioners' use of official jeweler contracts. Assuming that it is necessary for the fraternities' existence for them to maintain a high quality for their jewelry, it is by no means true that exclusive official jeweler contracts are the only means with which to accomplish this goal. Neither does it follow that petitioners must be the official jeweler for substantially all the fraternities. There is no showing that petitioners' competitors could not satisfy these needs of the fraternities.

Approximately 33% of the national college fraternities have obtained statutory protection under the Lanham Act, mostly at the urging of Balfour. The insignia rights of the remaining fraternities, if any, stem from common law rather than registration. We do not here decide whether fraternities have trademark protection, the extent of that protection and the duties necessary to maintain that protection. Even though all fraternities may have full common law and statutory rights in their insignia and that the exclusive dealing contracts between petitioners and each fraternity may be legal assignments of those rights, petitioners' illegal accumulation and enforcement of these agreements cannot, because of that, be immunized from the antitrust laws.

Petitioners contend, however, that their practices fall within the rule that the mere accumulation of patents or copyrights does not in itself constitute unlawful monopolization. See Automatic Radio Mfg. Co. v. Hazeltine Research, Inc., 339 U.S. 827, 834, 70 S.Ct. 894, 94 L.Ed. 1312 (1950); Transparent Wrap Machine Corp. v. Stokes & Smith Co., 329 U.S. 637, 67 S.Ct. 610, 91 L.Ed. 563 (1947); United States v. Winslow, 227 U.S. 202, 33 S.Ct. 253, 57 L.Ed. 481 (1913). We agree with petitioners that this general principle of patent-copyright law is equally applicable to trademark law. However, none of the cases cited by petitioners stands for the proposition that the accumulation of patents or copyrights may never constitute a violation of the antitrust laws.

The Third Circuit decision in Lawlor v. National Screen Service Corp., 270 F. 2d 146 (3d Cir. 1959), cert. denied 362 U.S. 922, 80 S.Ct. 676, 4 L.Ed.2d 742 (1960), relied on by petitioners, is distinguishable. In *Lawlor*, eight major motion picture producers each granted an exclusive license under their film copyright to National Screen Service Corp. to manufacture and distribute advertising accessories for films. Plaintiff, a competing distributor, contended that the accumulation of exclusive li-

censes violated the antitrust laws. The Third Circuit held that since the accessories for each movie under the licenses were non-competitive with those for all other movies, the accumulation of licenses did not amount to an illegal restraint of trade. In *Lawlor,* however, all distributors had an equal opportunity to secure licenses from the motion picture producers. Licenses were not a prerequisite for participation in the movie accessory market. There were alternative sources of supply for accessories, and defendants in no way engaged in any unfair practice either with respect to competition for licenses or for the ultimate sale of accessories. In fact, in concluding its discussion, the court stated: "a careful study of the record convinces us that this accumulation of copyright licenses was not used for improper purposes." *Id.,* 270 F.2d at 154. *Lawlor,* in contrast to this case, did not involve a supplier-licensee with monopoly power.

### B. *IRAC*

 The evidence amply supports the Commission's findings that petitioners organized, financed and operated the IRAC for their own benefit while cloaking it with the aura of impartiality. Through the IRAC, petitioners were able to police the market, threaten competitors with litigation, institute litigation, and petition the Federal Trade Commission to institute proceedings against one of its competitors. At the same time, petitioners were the official jewelers of 137 of the 140 fraternities that were members of the IRAC. In view of the history, direction and activities of the IRAC, the evidence precludes any conclusion other than that its use by petitioners was an unfair trade practice.

Lloyd Balfour, who has a controlling interest in petitioners, organized the IRAC and was its first chairman from 1946 to 1954. After serving as adminis-

trative secretary-treasurer for two years, and after retiring from the operation of the Balfour Company, he became an advisor for the IRAC. Even at this time, the funds of the IRAC were held in Balfour's name and at his office at Attleboro, Massachusetts.[6] IRAC offices were maintained in Attleboro at a personal expense to Mr. Balfour of $35,000 a year. Mr. Balfour was consulted on all IRAC decisions and approved of all IRAC activities which involved the petitioners.

Mr. Balfour used the IRAC as an organization by which to prohibit all unauthorized sales to fraternities by petitioners' competitors. He believed that the fraternities' trademark protection entitled them to maintain its exclusive dealings with petitioners. Actually, there had been no court decision or rule which held that the local chapters could not have dealings with suppliers other than the official jeweler. It was Balfour's belief that such sales were unauthorized that led to the IRAC's vigorous activities in this area. Letters were written on IRAC stationery to petitioners' competitors that their few sales of insignia goods violated the trademark laws and would be considered the basis of a lawsuit instituted by the IRAC. At the same time, the IRAC urged the fraternities to obtain statutory trademark protection. One of the hearing examiner's findings is pertinent:

> On March 11, 1955, Balfour employee Margaret O'Leary released the IRAC Bulletin, * * * This bulletin lists the names of more than 100 national college fraternities which "according to our IRAC files held in Attleboro * * * are registered in Attleboro," The Bulletin then states:
>
> > "We understand that a comparatively few [national college fraternities] have covered all official insignia including the coat-of-arms as

---

6. It was only when Balfour was involved in litigation against a fraternity goods competitor that he transferred the IRAC funds from Attleboro to IRAC's office in Washington, D. C.

well as your names and Greek letters. * * *

"If you are not registered IRAC *strongly recommends* your giving this subject *careful consideration.* Your registered claim of ownership will prevent duplication of your name and insignia * * * and will further assist you to legally control the manufacture and distribution of all approved items."

(Emphasis supplied.)

In addition, the IRAC persuaded two fraternities to institute suit under the trademark laws against petitioners' competitors and promised to finance the litigation.

### C. *Misrepresentation of Fraternities' Trademark Protection.*

The Commission found that petitioners had misrepresented to fraternities, suppliers and competitors that "all" or "practically all" fraternities had their insignia protected by the Lanham Act when only a minority had such protection. By this, petitioners discouraged competitors from entering the field. Petitioners do not contest the truth of these statements, but maintain that this charge is not contained in the complaint. ▮ We agree with petitioners that they were given no notice of this unfair practice. The first time it was mentioned was in the Commission counsel's proposed findings to the Commission [see N. L. R. B. v. Majestic Weaving Co., 355 F.2d 854 (2d Cir. 1966); Northeastern Indiana Building & Construction Trade Council v. N. L. R. B., 122 U.S.App.D.C. 220, 352 F.2d 696, 699 (1965)]. The findings of the Commission on this issue and the final order insofar as it depends upon this finding alone are reversed. The evidence of misrepresentation of the fraternities' trademark protection, however, does add weight to the finding of the more general unlawful use of the IRAC and its role in harassing petitioners' competitors.

### D. *Disparagement.*

The hearing examiner made 27 detailed findings which document petitioners' continuous policy of derogating the right of competitors to make sales to fraternity members, the quality of their goods and the ethics of their trade practices. The Commission, briefly mentioning this issue in its opinion, stated:

[Balfour's and BPA's] contentions that they have not disparaged their competitors are contradicted by the record evidence. * * * They have also stated the competitors' products were of secondary quality, poor workmanship and so forth. They introduced no evidence to support these statements.

Petitioners argue that the Commission has shifted the burden of proof to petitioners in violation of Section 7 of the Administrative Procedure Act, 5 U.S.C. § 556. Yet, in the context of the Commission's opinion and the findings of the hearing examiner, a correct interpretation of the Commission's position is that petitioners offered no rebuttal testimony to the overwhelming case of disparagement made against them.

▮ Similarly, we find no merit in the petitioners' contention that the Commission made no explicit finding of falsity of the alleged disparaging statements. Section 5 punishes those statements which create a deceptive impression on purchasers even though they may be technically interpreted as true or partially true. See Kalwajtys v. F. T. C., 237 F.2d 654 (7th Cir. 1956), cert. denied 352 U.S. 1025, 77 S.Ct. 591, 1 L. Ed.2d 597 (1957); P. Lorillard Co. v. F. T. C., 186 F.2d 52 (4th Cir. 1950). The indiscriminate nature of petitioners' statements about competitors amounts to a Section 5 violation for disparagement. The evidence indicates that the fraternities relied on the statements made by petitioners in attacking the quality of its competitors' goods. Further, petitioners' attacks on the poor workmanship of their competitors' goods is false

since, in some instances, both the petitioners and these competitors used the same suppliers, and the goods received were the same.

We sustain the Commission's findings that the use of the word "pirate" constitutes disparagement. "Pirate" may be a term of art in the trademark field, referring to an infringer. See Oneida Ltd. v. National Silver Co., 25 N.Y.S.2d 271, 275 (Sup.1940). However, as used by petitioners to persons unversed in trademark law, without distinguishing authorized or unauthorized transactions, and coupled with petitioners' other disparaging statements, the term "pirate" becomes an instrument of disparagement.

### E. *BPA and Edwards Haldeman.*

The findings of the hearing examiner establish that at times relevant to this proceeding Balfour owned BPA and Edwards Haldeman, which is no longer in existence. Balfour operated these subsidiaries secretly, Edwards Haldeman during its existence, and BPA until 1959, when it was announced that Balfour's acquisition of BPA was imminent, although the actual acquisition had occurred some 35 years earlier. The secret operation of BPA allowed petitioners to maintain and increase their monopolization of the national college fraternity market while maintaining a facade of vigorous competition. Similarly, by operating separately, Balfour and BPA were able to obtain exclusive official jeweler contracts with fraternities that required co-official jewelers.

The Commission held that the secret acquisition and operation of BPA by Balfour constituted monopolization and foreclosed the market. The Commission stated:

We are unpersuaded by [Balfour's and BPA's] * * * arguments that their acquisition and operation of BPA plus Edwards Haldeman was well known and did not adversely affect competition. The complaint did not charge these acquisitions as violations of Section 7; rather, it clearly alleged that by secretly acquiring and operating these competitors Balfour increased its market control while projecting an image of extant competition. * * * An examination of the facts as found by the examiner requires us to conclude that Balfour covertly purchased and operated BPA and Edwards Haldeman in order to maintain and increase their monopolistic position. As such this action constituted an unfair method of competition.

Petitioners challenge this ruling of the Commission in two respects. They argue that any finding regarding the acquisition of BPA and Edwards Haldeman, which concededly occurred before 1951, violates the consent order entered in proceedings instituted by petitioners against the Commission in the District Court for the Eastern District of Virginia; and further, that there was no allegation in the complaint of *secret* acquisition or secret operation, thereby depriving petitioners of notice of the charges against them.

The provisions of the consent order which are relevant provide:

1. That all oral and documentary evidence relating to events, transactions and business conduct occurring prior to June 16, 1951, will be physically excised from the record. * * *

2. Both the initial decision of the hearing examiner * * * and the decision and final order of the defendant commission * * * will be based solely upon the excised administrative record. * * *

* * * * * *

6. The allegations of the administrative complaint in the aforesaid administrative proceeding shall be limited to ten years prior to June 16, 1961.

 The import of this consent order is that all conduct occurring before June 16, 1951, should not be considered relevant for purposes of the instant proceeding. The record as excised pursuant to the consent order and the find-

ings of the hearing examiner support the fact that Balfour "covertly purchased * * * BPA and Edwards Haldeman in order to maintain and increase [its] * * * monopolistic position." Although the acquisitions themselves are admitted, there is no direct evidence in the excised record of the manner, motive or effect of the acquisitions. However, any inference from the post-June 16, 1951, secret operation of BPA and Edwards Haldeman of the manner of acquisition, its motives or effects, violates the terms of the consent order. All references in the Commission's findings to the secret acquisition of BPA and Edwards Haldeman by Balfour is barred by the consent order and should be stricken. We believe, however, that, disregarding the evidence on the acquisition, Balfour's secret operation of BPA and Edwards Haldeman, while it held them out as competitors, violates Section 5 as monopolistic conduct.

The record and findings of the Commission overwhelmingly support the conclusion that Balfour secretly operated BPA until an announcement of impending acquisition was made in 1959, and secretly operated Edwards Haldeman until it went out of existence in 1954. Petitioners contend, however, that since the administrative complaint did not charge Balfour with the *secret* operation (and acquisition) of BPA and Edwards Haldeman, they were deprived of their right to be apprised of the charges against them as guaranteed by the due process clause of the fifth amendment, the Administrative Procedure Act, 5 U. S.C. § 554, the Federal Trade Commission Act, 15 U.S.C. § 45(b), and the Commission's Rules of Practice, 16 C.F. R. § 3.11(b).

 There is no requirement that a complaint in an administrative proceeding enumerate precisely every event to which a hearing examiner may finally attach significance. The purpose of the administrative complaint is to give the responding party notice of the charges against him. See 1 Davis—on Administrative Law Treatise §§ 8.04– 8.05 and cases cited therein. The complaint is adequate if "the one proceeded against be reasonably apprised of the issues in controversy, and any such notice is adequate in the absence of a showing that a party was misled." Cella v. United States, 208 F.2d 783, 789 (7th Cir. 1953), cert. denied 347 U.S. 1016, 74 S. Ct. 864, 98 L.Ed. 1138 (1954); Swift & Co. v. United States, 393 F.2d 247, 252 (7th Cir. 1968). As the Commission case against petitioners unfolded, there was a "reasonable opportunity to know the claims of the opposing party and to meet them." Morgan v. United States, 304 U.S. 1, 18, 58 S.Ct. 773, 776, 82 L. Ed. 1129 (1938); Swift & Co. v. United States, *supra*, 393 F.2d at 252. In the instant case, there is no claim that the petitioners were misled by the complaint, nor is there any evidence in the record that they could have been so misled. The issue of the secret operation of BPA and Edwards Haldeman was fully and fairly litigated before the hearing examiner and argued before the Commission. We find no prejudicial error.

### F. *Exclusive Supply Contracts.*

The Commission also found that the petitioners' exclusive dealing contracts with their suppliers in which the suppliers agreed not to sell to petitioners' competitors, violated Section 5 as a monopolistic business practice. Evidence indicates that petitioners entered into these contracts with suppliers who were also being used by the competitors. Some competitors were unable to find and maintain suppliers.

 Petitioners assert that these exclusive contracts have not been shown to violate Section 5 because there was no evidence of foreclosure of the relevant market. A case under Section 3 of the Clayton Act, 15 U.S.C. § 14, must have specific evidence of market foreclosure in a relevant market in which the exclusive contracts exist. Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). But no such proof is necessary in an exclusive

dealing contract case under Section 5. F.T.C. v. Brown Shoe Co., 384 U.S. 316, 86 S.Ct. 1501, 16 L.Ed.2d 587 (1966). In this case, however, there is substantial evidence that the exclusive supply contracts were anti-competitive. National college fraternity insignia-bearing goods was defined as the relevant market. Several suppliers were cited as parties to these exclusive dealing contracts. Competitors testified of their inability to obtain certain suppliers.

### HIGH SCHOOL CLASS RINGS

The other phase of the Commission's opinion and order relates to Balfour's activities in the manufacture, distribution and sale of class rings to high schools throughout the country. It is customary for high school students in their junior or senior year to purchase class rings bearing the school's insignia. Annual sales in this market total between $45 and $50 million. Balfour and two of its competitors share about 60% of the market; in 1960, Balfour's sales of $7.7 million constituted 17% of total market sales. Balfour uses term purchase agreements in connection with the sales of high school rings. The contracts, in which the purchaser schools appoint Balfour as their exclusive seller, are usually of three to five years in duration, but are terminable by the schools at any time and, admittedly, are not legally binding. The Commission found, however, that they are usually honored and renewed.

The agreement itself contains a provision in which the high school official indicates his intention to order all of the required rings for the school from Balfour for the term of the agreement if he is satisfied with Balfour's performance. It does not establish specifications as to the exact nature, price or delivery of the rings. A binding contract with more specific terms is made when an order is placed by the high school for a stated number of rings. On some occasions, Balfour and one of its competitors annually rotate as alternate exclusive suppliers. Balfour explains that these term

purchase agreements enable the school to buy at a less expensive price since the cost of production can be amortized by Balfour over the contract's specified life span. By appointing one company as the exclusive supplier, the agreements save the time and bother of the school officials and keep to a minimum the contacts between vying sellers and students. Between 85 to 90% of Balfour's sales in high school class rings are effectuated under these agreements. Its competitors use these agreements for only 30 to 50% of their sales.

The Commission found that Balfour's use of term purchase agreements with high schools constituted exclusive dealing contracts, which foreclose competition, prevent entry of new competitors and serve to stabilize the market in a fixed position in conflict with the policy of Section 3 of the Clayton Act, 15 U.S. C. § 14. For that reason, the Commission concluded that their use in this case was a Section 5 violation.

The record supports the finding that the term purchase agreements were anti-competitive at the schools in which they were in effect. The question petitioners present is whether this mere finding of market foreclosure is sufficient to support a Section 5 violation.

Exclusive dealing contracts are not illegal *per se* under Section 3 of the Clayton Act; it must be shown that they substantially lessen competition or tend to create a monopoly in the relevant market. There must also be proof that the user of the exclusive dealing contract controls a "substantial" share of the market. Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 81 S. Ct. 623, 5 L.Ed.2d 580 (1961); Standard Oil Co. of California v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949).

The Commission, however, need not find all the elements necessary to establish a Section 3 Clayton Act violation in holding exclusive dealing contracts illegal under Section 5. F.T.C. v. Motion Picture Adv. Service Co., 344 U.S. 392,

394–395, 73 S.Ct. 361, 97 L.Ed. 426 (1952). See also, Atlantic Rfg. Co. v. F.T.C., 381 U.S. 357, 85 S.Ct. 1498, 14 L.Ed.2d 443 (1965); Fashion Originators' Guild v. F.T.C., 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941).

We believe that F.T.C. v. Brown Shoe Co., Inc., 384 U.S. 316, 86 S.Ct. 1501, 16 L.Ed.2d 587 (1966), controls. In that case, Brown offered inducements in contracts to retailers to sell Brown's shoes only and none of its competitors. The Commission, without a finding of substantial lessening of competition, held that Brown's exclusive dealing contracts were illegal under Section 5. The Supreme Court, in upholding the Commission decision, stated:

The Commission has broad powers to declare trade practices unfair. This broad power of the Commission is particularly well established with regard to trade practices which conflict with the basic policies of the Sherman and Clayton Acts even though such practices may not actually violate these laws. * * * [Brown's] program obviously conflicts with the central policy of both § 1 of the Sherman Act and § 3 of the Clayton Act against contracts which take away freedom of purchasers to buy in an open market. Brown nevertheless contends that the Commission had no power to declare the franchise program unfair without proof that its effect "may be to substantially lessen competition or tend to create a monopoly" which of course would have to be proved if the Government were proceeding against Brown under § 3 of the Clayton Act rather than § 5 of the Federal Trade Commission Act. We reject the argument that proof of this § 3 element must be made. *Id.* at 321–322, 86 S.Ct. at 1504.

■ Further, the petitioners assert that the Commission erroneously failed to define a relevant market. However, the hearing examiner considered evidence which showed that high school class rings was a relevant market when considering whether petitioners monopolized the market. There is additional evidence concerning Balfour's share in that market. See *supra*. We agree with these findings. Besides this, cases under Section 5, in contrast to Section 3 of the Clayton Act, attacking the validity of exclusive dealing contracts do not require the definition of a market, but rather some showing of a lessening of competition. F.T.C. v. Brown Shoe Co., Inc., 384 U.S. 316, 86 S.Ct. 1501, 16 L.Ed.2d 587 (1966); Standard Oil Co. of California v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949).

The evidence demonstrates that these term purchase agreements had an anticompetitive effect on the market. A number of competitors testified that it was difficult to break into markets which utilized these contracts. A smaller company found it difficult to enter the high school market in Southern California: "* * * Most of the schools, upon being contacted, would answer that they were under contract and that the contract had not yet expired." Those who used term purchase agreements said they were valuable because they protected them from open competition and provided for stability and planning.

■ Finally, petitioners claim that the Commission deprived them of a fair hearing by shifting its theory of the case on appeal. The Commission rejected the hearing examiner's findings on monopolization, but held the term purchase agreements illegal. But, the issue of the legality of these agreements was litigated before the Commission, and the petitioners had an opportunity to defend on this issue. This is not "an entire abandonment of the very substance of the dispute to which the defendant was summoned, and the substitution of another which he could not have anticipated, and which he had no opportunity to meet." Armand Co. v. F.T.C., 84 F.2d 973, 974–975 (2d Cir. 1936). Rodale Press, Inc. v. F.T.C., 132 U.S.App.D.C. 317, 407 F.2d 1252 (1968), cited by petitioners, holds that a party would be de-

prived of no right if he had an opportunity to respond to the new or different charges. We find that the petitioners were aware, at the hearing level, that the legality of the term "purchase agreements" was an issue in the litigation.

## THE COMMISSION'S ORDER

The Commission entered a detailed order designed to prohibit those activities found to be violative of Section 5. With respect to that portion of the order remedying the conditions in the national college fraternity insignia market, the Commission stated its broad objectives:

If competition is to be recreated in this industry, it is essential that the inertia engendered by [Balfour's and BPA's] monopolization be broken. [Balfour's and BPA's] customers must be stimulated to re-examine their purchasing policies, and [Balfour's and BPA's] competitors, actual and potential, must be afforded some opportunity to gain access to the re-opened market. The provisions of the * * * order are appropriately designed to breathe new vitality into this field.

The order, in pertinent part, provides:

*Part I*—Petitioners shall terminate all existing contracts with any fraternity relating to the sale or distribution of fraternity products.

*Part II*—(1) Petitioners shall not engage in any plan or device, by contract or otherwise, which has the effect of foreclosing competition for the fraternity market;

(2) Shall not enter into or maintain sole official jeweler contracts or any contract which requires fraternities to purchase all of their requirements from petitioners;

(3) Shall not, for a period of 5 years, enter into or maintain any contract with any fraternity of more than one year's duration;

(4) Shall not represent that they are the sole official jewelers of any fraternity;

(5) Shall not participate in any manner, financially or otherwise, in the affairs of any organization composed of more than one fraternity.

*Part III*—(1) Petitioners shall not represent that any competitor is making unauthorized sales of fraternity products;

(2) Shall not induce fraternities not to deal with competitors;

(3) Shall not acquire for a period of 10 years any company having more than 10% of its total sales in fraternity products without the consent of the Commission;

(4) Shall not enter into exclusive supply contracts with suppliers of fraternity products.

*Part IV*—Balfour shall divest itself of BPA insofar as BPA is engaged in the fraternity market and shall not deal with those fraternities for 5 years which were under contract to BPA as of June 16, 1961 (date of issuance of the complaint).

*Part V*—(1) Petitioners shall cease from "[F]alsely imputing to any competitor dishonorable conduct, inability to perform contracts, questionable credit standing, or falsely disparaging any competitor's products, business methods, selling prices, values, credit terms, policies or services;"

(2) Shall cease from enticing employees away from competitors for the purpose of injuring competitors;

(3) Shall cease from entering into any exclusive contract with suppliers of "findings." [7]

The portion of the order relating to the Section 5 violation in the high school class ring market states:

*Part VI*—Petitioners shall cease from entering into or maintaining any con-

---

7. "Findings" are jewelry which, when delivered to Balfour, do not bear insignia. The insignia is later added by Balfour prior to its distribution to the fraternities.

tract with any high school for class rings which:

(1) Fails to set forth all of the terms essential to enable performance of such contract;

(2) Continues for more than one year. Under certain conditions, however, contracts for a 3-year duration are permitted;

\* \* \* \* \* \*

(4) Is signed "more than sixty days prior to the date upon which the terms of such contract \* \* \* is to begin;"

(5) Allows Balfour to alternate or rotate with any competitor as the exclusive supplier.

■ It is well settled that the choice of the remedial order is committed to the discretion of the Commission. F.T. C. v. Mandel Bros., Inc., 359 U.S. 385, 392–393, 79 S.Ct. 818, 3 L.Ed.2d 893 (1959); Niresk Industries, Inc. v. F.T. C., 278 F.2d 337, 343 (7th Cir. 1960), cert. denied 364 U.S. 883, 81 S.Ct. 173, 5 L.Ed.2d 104 (1960). Except where the remedy selected bears no reasonable relation to the unfair practices found to violate Section 5, the courts will not reverse or modify the Commission's choice. F.T.C. v. National Lead Co., 352 U.S. 419, 428–429, 77 S.Ct. 502, 1 L.Ed.2d 438 (1957); National Baker Services, Inc. v. F.T.C., 329 F.2d 365, 367 (7th Cir. 1964).

We find that the order in this case is reasonably related to the unfair practices and adequately designed to restore competition in both the national college fraternity goods and high school class ring markets.

■ The Commission has the power to order divestiture to restore competition. F.T.C. v. Dean Foods Co., 384 U.S. 597, 606 n. 4, 86 S.Ct. 1738, 16 L.Ed.2d 802 (1966); see Pan American World Airways, Inc. v. United States, 371 U.S. 296, 312–313 nn. 17 and 18, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963). Further, an order of divestiture is no less proper even though it is not used where "other effective methods, less harsh, are available."

Timken Roller Bearing Co. v. United States, 341 U.S. 593, 603, 71 S.Ct. 971, 977, 95 L.Ed. 1199 (1951). To this point, the Commission stated:

[I]t would be a manifestly vain act simply to prohibit [petitioners] from making future acquisitions of their competitors. \* \* \* In order to restore competition it is essential that BPA be divested from Balfour so that it can resume its independence and offer fraternities the competition which —prior to May, 1959—they believed they were getting.

We agree. We also believe that this order of divestiture is not affected by the fact that some evidence barred by the consent order concerning Balfour's acquisition of BPA might have seeped into the record. The divestiture order is based on the other and proper findings in the record which show that Balfour secretly operated BPA as its subsidiary but held it out as a competitor.

■ It was also proper for the Commission to forbid Balfour from selling fraternity products to any fraternity that an official, co-official or sole official contract with BPA as of June 16, 1961. We cannot accept Balfour's argument that this remedial provision is anti-competitive. Competition cannot be revived instantly in a market which has been dominated by one firm for many years. The five years prohibition against contracts with BPA's customers is reasonable in order to allow BPA to reacquire competitive vigor. Without such a prohibition, the ordered divestiture of BPA might well be a futile gesture. Similarly, the ordered termination of official jeweler contracts with the fraternities and a prohibition against entering into new exclusive dealing contracts are designed to eliminate petitioners' monopoly power. See United States v. International Boxing Club of New York, Inc., 171 F.Supp. 841, 842 (S.D. N.Y.1957), affirmed, 358 U.S. 242, 247, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959).

■ Petitioners also attack that part of the order which prohibits them

from representing that "any competitor has manufactured, distributed or sold any or all types of fraternity products without permission or authorization of any fraternity or fraternities." Petitioners argue that this prohibits them from telling the truth and is therefore a violation of their First Amendment rights. We agree with this contention. The Commission may, of course, prohibit false statements or true statements which in total effect are misleading. Murray Space Shoe Corp. v. F.T.C., 304 F.2d 270, 272 (2d Cir. 1962); Ward Laboratories v. F.T.C., 276 F.2d 952, 954, cert. denied 364 U.S. 827, 81 S.Ct. 65, 5 L.Ed.2d 55 (1960). But, the Commission may not prohibit the telling of a true statement even if that representation perpetuates the dominance of a monopolist. See Crosby v. Bradstreet Co., 312 F.2d 483 (2d Cir. 1963), cert. denied 373 U.S. 911, 83 S.Ct. 1300, 10 L.Ed.2d 412 (1963); Scientific Mfg. Co. v. F.T.C., 124 F.2d 640 (3d Cir. 1941). The order must be modified to prohibit only false statements.

We also find that the Commission's order relating to the exclusive supply contracts and the petitioners' enticing away of employees from competitors to be proper and reasonable.

■■■■ With respect to the order relating to the high school class ring market, petitioners contend that the Commission abused its discretion in ordering Balfour to cease and desist from use of term purchase agreements, when that device has been used by all major competitors for the past thirty years. The law is clear, however, that the Commission has the power to enter an order against one firm that is practicing an industry-wide illegal trade practice. F.T.C. v. Universal Rundel Corp., 387 U.S. 244, 87 S.Ct. 1622, 18 L.Ed.2d 749 (1967); Standard Oil Co. of California v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949); Moog Industries Inc. v. F.T.C., 355 U.S. 411, 78 S.Ct. 377, 2 L.Ed.2d 370 (1958). Indeed, there have been no instances where an order has been set aside simply because it was directed against a single violator

in the face of industry-wide violations. Rabiner & Jontow, Inc. v. F.T.C., 386 F.2d 667, 669 (2d Cir. 1967). However, the Commission's orders are to serve a remedial and not a punitive function. F.T.C. v. Ruberoid Co., 343 U.S. 470, 72 S.Ct. 800, 96 L.Ed. 1081 (1952); Niresk Industries, Inc. v. F.T.C., 278 F.2d 337 (7th Cir. 1960), cert. denied, 364 U.S. 883, 81 S.Ct. 173, 5 L.Ed.2d 104 (1960), and the Commission may not issue orders which would arbitrarily destroy one of many violators in the market. F.T.C. v. Universal Rundel Corp., 387 U.S. 244, 251, 87 S.Ct. 1622, 18 L.Ed.2d 749 (1967). It is the responsibility of the Commission to perform a "reasonable evaluation" of the competitive situation to ascertain whether a particular order would be contrary to the purpose of the laws sought to be enforced. *Id.* at 251–252, 87 S.Ct. 1622.

■■■ The Commission performed this evaluation and entered an order which is neither punitive nor likely to destroy petitioner Balfour. The Commission must be accorded latitude in forming its orders for "the Commission alone is empowered to develop that enforcement policy best calculated to achieve the ends contemplated by Congress and to allocate its available funds and personnel in such a way as to execute its policy efficiently and economically." Moog Industries, Inc. v. F.T.C., 355 U.S. 411, 413, 78 S.Ct. 377, 379, 2 L.Ed.2d 370 (1958).

## PROCEDURE BEFORE THE HEARING EXAMINER

In 1961, counsel for the Commission adduced the testimony of officials from twenty-one competitiors of the petitioners. In general, these officials testified about the nature of their businesses, their competition, and the effect of the petitioners' practices on their businesses. At the end of cross-examination, counsel for petitioners moved for discovery of all correspondence and signed statements of five of the witnesses and moved that certain interview reports be submitted to the hearing examiner for a determination of whether they contained "substantially verbatim recitals" of the

witnesses' oral statements. Upon representations of Commission counsel that there were no signed statements other than correspondence and that the interview reports did not contain a "substantially verbatim recital" of the witnesses' statements, the hearing examiner denied the discovery motion and the alternative motion to strike the witnesses' testimony.

In 1965, during its rebuttal case, petitioners once again moved to strike the testimony of the five witnesses on the ground that Commission counsel had failed to produce statements, letters and other writings relating to their testimony. Thereupon, counsel for the Commission produced to the hearing examiner for his inspection materials relating to the testimony of four of these witnesses. The hearing examiner, over objection, turned all of the records over to petitioners. After petitioners' counsel briefly examined these documents in the hearing room, they were returned to the Commission counsel for the purpose of having copies made. Before returning the copies to the petitioners, Commission counsel took an interlocutory appeal to the full Commission which ruled that the hearing examiner erred in turning over the documents. The Commission held that discovery is to be available in F.T.C. proceedings when allowable under the Jencks Act, 18 U.S.C. § 3500(e).

Section (e) limits discovery to statements within the following categories:

(1) "a written statement made by said witness and signed or otherwise adopted or approved by him;" (2) "a stenographic, mechanical, electrical, or other recording, or transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement."

On remand to the hearing examiner, he was given the documents to determine whether they fell within these categories. Portions of the materials were furnished to the petitioners.

Petitioners here contend that the *Jencks* case (Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L. Ed.2d 1103 (1957)) is applicable and that the denial of access to the witnesses' statements deprived them of due process and constituted reversible error. Since we are convinced that any error of the Commission or hearing examiner in this regard is harmless on this record, we need not reach this issue.[8]

The proceedings before the hearing examiner lasted over five years, and resulted in about 6,000 pages of testimony, hundreds of exhibits and four hundred and twenty-nine detailed findings of fact. Not one of the findings nor any part of the Commission's opinion rests solely on the testimony of the five witnesses in question. These witnesses were five of twenty-one competitors that testified. Besides this, petitioners were given the expurgated testimony of four of the witnesses which conformed to the Jencks Act. After examining these statements, counsel for the petitioners

8. We note that in the context of both criminal and civil proceedings there has been a marked and strong movement of the courts towards full and free discovery of all matters relevant to the case. As the Supreme Court said in Dennis v. United States, 384 U.S. 855, 870, 86 S.Ct. 1840, 1849, 16 L.Ed.2d 973 (1966):

"These developments are entirely consonant with the growing realization that disclosure, rather than suppression, of relevant materials ordinarily promotes the proper administration of criminal justice."

It is clear that the Jencks Act does not bind the Commission. That statute, enacted to restrict the impact of the *Jencks* case, is by its very terms peculiarly concerned with and applicable to criminal judicial proceedings. On the other hand, the rules in the *Jencks* case, based not upon due process but upon the Court's power to prescribe procedures for the administration of criminal justice, have not yet been applied to the F.T.C. although they have been applied to several other agencies. See Harvey Aluminum, Inc. v. N. L. R. B., 335 F.2d 749 (9th Cir. 1964), and cases cited therein; 1 Davis on Administrative Law Treatise, § 8.15 (1958) (Supp.).

did not recall the witnesses, but entered into a stipulation with respect to the testimony of one witness.

Therefore, we hold that the error, if any, did not prejudice the decision of the Commission and is not reversible.

Accordingly, for the reasons stated, we enforce the order of the Commission and affirm its decision with the following exceptions: (1) We reverse that part of the Commission's order enjoining the petitioners from representing that "any competitor [in the national college fraternity insignia goods market] has manufactured, distributed or sold any or all types of fraternity products without permission or authorization of any fraternity or fraternities." The order is limited to prohibiting only false statements. (2) We reverse the Commission's findings that petitioners misrepresented the extent of the fraternities' trademark protection. (3) We reverse the Commission's findings as to Balfour's secret acquisition and operation of BPA and Edwards Haldeman to the extent that it relied on pre-1951 evidence which was barred by the 1964 consent order. Nonetheless, we enforce the divestiture order since it is based on evidence of post-1951 conduct.

Enforced in part, reversed in part.