GIANT PAPER AND FILM CORPORATION and Merchant Suppliers Paper Co., Plaintiffs,

v.

ALBEMARLE PAPER COMPANY and Hoerner Waldorf Corporation, Defendants.

No. 73 Civ. 3554.

United States District Court, S. D. New York.

March 25, 1977.

■■■■■■■■■■■■■

Raphael, Searles, Vischi, Scher, Glover & D'Elia, New York City, for plaintiffs by Sidney O. Raphael, Robert E. Scher, New York City, of counsel.

Winthrop, Stimson, Putnam & Roberts, New York City, for defendants by Gordon G. Busdicker, James B. Loken, Faegre & Benson, Minneapolis, Minn., of counsel.

## OPINION AND ORDER

KEVIN THOMAS DUFFY, District Judge.

This case was placed on the ready trial calendar, all discovery having been completed. Defendants now move for partial summary judgment based on the pleadings, discovery and affidavits submitted in support of the motion.

This action was commenced in August, 1973, seeking treble damages for alleged violations of the federal antitrust laws, particularly Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14. Defendant Hoerner Waldorf Corporation ("Hoerner Waldorf") is an integrated manufacturer of paperboard and paperboard products. On October 31, 1968, it acquired all the assets of defendant Albemarle Paper Company ("Albemarle"), including a Kraft process pulp and paper mill located at Roanoke Rapids, North Carolina. Prior to its acquisition as a Hoerner Waldorf subsidiary, Albemarle was engaged in the manufacture and distribution of pulp and various types of paper, including Kraft wrapping paper.

Plaintiffs are parent and subsidiary corporations engaged in the business of supplying a variety of products, including Kraft wrapping paper, to the apparel industry. It is undisputed that for some thirty years prior to the Albemarle acquisition in 1968 plaintiffs had purchased all of their requirements of Kraft paper from Albemarle's Roanoke Rapids mill at liberal payment and discount terms. After the acquisition by Hoerner Waldorf, plaintiffs were assured that their supply relationship would not be altered, and through 1971, plaintiffs' Kraft paper needs continued to be met by the Albermarle subsidiary. However, the supply relationship began to change. Plaintiffs' discount and payment practices were contrary to Hoerner Waldorf's credit policies and triggered heated discussions between the parties. On one occasion, as a result of Hoerner Waldorf's enforcing the invoice terms, plaintiffs remitted $3,100 taken in discounts; during the same period, after complaining of paper quality, plaintiffs returned a shipment to the Roanoke Rapids mill.

Sometime in late 1971 or early 1972, representatives of defendants informed Irving Jacklin, plaintiffs' president, that plaintiffs' supply of Kraft paper would be reduced since Hoerner Waldorf's internal demand for the paper had substantially increased. A cut back followed. In January 1973, purportedly as a result of the rising internal demand, coupled with the continuing payment, discount and quality disputes between the parties, defendants ceased supplying plaintiffs. The termination coincided with a nationwide shortage of Kraft paper and, despite plaintiffs' securing an alternate supplier in 1971 who supplied comparatively minimal amounts of Kraft paper to plaintiffs through 1974, plaintiffs claim that they were totally eliminated from the Kraft paper market.

On December 31, 1974, Albemarle was merged into its parent, Hoerner Waldorf.[1] Plaintiffs do not claim damages after this date.

All of plaintiffs' antitrust claims are rooted in defendants' decision to sever the supply relationship with plaintiffs during a nationwide Kraft paper shortage. The question presented by this motion is whether the pleadings and proof submitted by plaintiffs are sufficient to raise any genuine factual issues as to the elements necessary to constitute the alleged antitrust violations. In resolving this question, I am not unmindful of judicial reluctance to grant summary judgement in complex antitrust cases; See *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 472, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), but I am equally aware that plaintiffs have had every opportunity to develop the facts to support their claims while completing substantial amounts of discovery of a two-and-one-half year period. See *Beckman v. Walter Kidde & Company*, 316 F.Supp. 1321 (S.D.N.Y.1970), *aff'd* 451 F.2d 593 (2d Cir. 1971), *cert. denied* 408 U.S. 922, 92 S.Ct. 2488, 33 L.Ed.2d 333 (1972).

## EXCLUSIVE DEALING

Plaintiffs contend that because they were required to look exclusively to defendants for their total supply of Kraft paper, defendants violated Section 3 of the Clayton Act, 15 U.S.C. § 14, prohibiting exclusive dealing arrangements.[2] Defendants claim that no contractual restraint was ever imposed on plaintiffs and that plaintiffs have adduced no proof to evidence any arrangement other than an election to buy exclusively from Albemarle, and later, Hoerner

Waldorf, so long as it was advantageous to do so.

To support their position, plaintiffs have submitted letters from S. Douglas Fleet, Albemarle's Vice-President and Sales Manager from 1940 to 1963, and Larry Norton, Fleet's successor, who became Vice-President of Hoerner Waldorf's Mill Division after the acquisition of Albemarle. The Fleet letter merely attests to the length of the supply relationship between Albemarle and plaintiffs. (Pl. Ex. A1). The Norton letter, dated September 3, 1968, indicates that, despite the acquisition, Albemarle "intends to continue to do business as usual," and advises plaintiffs that "there should be no reason why you should look for another source of supply on your regular Natural Wrapping." (Pl. Ex. D1). Although it is doubtful that this letter evidences a factual issue as to an interdiction of the type claimed, particularly since plaintiffs contacted an alternate source in late 1971 which supplied them with Kraft paper, albeit in small amounts, even were the exclusivity allegation taken as true, the Clayton Act claim must fail as a matter of law.

Section 3 prohibits exclusive dealing agreements only if competition in a substantial share of the line of commerce affected is foreclosed as a result. *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). Such a determination turns on a detailed analysis of the relevant market and the context in which the exclusive dealing arrangement is employed. *Id.* Plaintiffs allege neither competitive effect nor market impact resulting from the supply arrange-

---

**1.** I note that in light of the merger, there is presently but one proper party defendant; however, plaintiff has named both Hoerner Waldorf and Albemarle as defendants, and they shall be treated as such for the purposes of this motion.

**2.** Section 3 of the Clayton Act, 15 U.S.C. § 14, in relevant part, provides:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, to . . . make a sale or contract for sale of goods . . . supplies, or other commodities, . . . for use, consumption or resale within the United States . . . or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the . . . purchaser thereof shall not use or deal in the goods . . . supplies, or other commodities of a competitor or competitors of the seller, where the effect of such . . sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

ment with defendants, relying, instead, on a *per se* violation resulting from the mere fact of exclusivity.[3] This position directly contravenes *Tampa Electric,* which rejected a *per se* approach. Since no effective Section 3 violation has been alleged either in the pleadings or after discovery, no factual issue exists with respect to this claim. Summary judgment in favor of defendants is therefore granted on this issue.

## CONSPIRACY IN RESTRAINT OF TRADE

■ Section 1 of the Sherman Act, 15 U.S.C. § 1, prohibits conspiracies in restraint of trade. Plaintiffs charge both an intra-enterprise conspiracy between Hoerner Waldorf and Albemarle, and a conspiracy between defendants and third parties to drive plaintiffs out of the Kraft paper market. Defendants argue, without conceding restraint of trade, that the proof submitted shows a clear absence of the concert of action required for a Section 1 violation.[4]

■ With regard to the intra-enterprise conspiracy claim, it is clear that the concerted action of a parent corporation and its subsidiary is not necessarily immunized from a Section 1 challenge by reason of their common ownership. *Perma-Life Mufflers, Inc. v. Int'l Parts Corp.,* 392 U.S. 134, 141–42, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968); *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.,* 340 U.S. 211, 215, 71 S.Ct. 259, 95 L.Ed. 219 (1951); *United States v. Yellow Cab Co.,* 332 U.S. 218, 227, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947). However, if the two entities, notwithstanding their separate status, functioned essentially as a single business unit, the conspiracy

claim must fail. *See Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co.,* 370 U.S. 19, 82 S.Ct. 1130, 8 L.Ed.2d 305 (1962); *Beckman v. Walter Kidde & Co., supra.*

■ Defendants have offered ample uncontested proof to show that they functioned as a single competitive and business entity. The affidavit of Charles O'Connell, Secretary and General Counsel of Hoerner Waldorf, and former Secretary of the Albemarle subsidiary, attests that prior to the acquisition, Hoerner Waldorf was not in the Kraft paper business, and that after Albemarle was acquired, Hoerner Waldorf undertook to integrate the subsidiary into the parent's operations. The Albemarle assets were placed in a newly formed subsidiary, defendant Albemarle, solely for tax and other purposes unrelated to achieving integration. The Roanoke Rapids mill was placed within Hoerner Waldorf's Mill Division, under the supervision of a corporate officer located at Hoerner Waldorf's headquarters in St. Paul, Minnesota. Pricing, credit and sales functions for the mill's paper products were performed in St. Paul in conjunction with other Hoerner Waldorf departments. Invoices for mill products were prepared in St. Paul and payments were received through Hoerner Waldorf's Finance Department; credit problems were handled by the Corporate Credit Division. Local mill personnel were answerable to Hoerner Waldorf personnel, and the purchasing of mill supplies was centralized in St. Paul.

While the use of the tradename of Albemarle continued until the companies

---

**3.** Plaintiffs cite *L. G. Balfour Co. v. FTC,* 442 F.2d 1 (7th Cir. 1971) as support for the proposition that proof of market foreclosure is unnecessary. That case, however, was brought under Section 5 of the Federal Trade Commission Act, and specifically noted the difference in standards of proof required of a private plaintiff suing under the Clayton Act. *Id.* at 19–20.

**4.** It is basic that a manufacturer is free to deal with whomever he chooses and may discontinue a business relationship for reasons of his own, and any injurious effect on the business

of the discontinued distributor is immaterial, in the absence of any anticompetitive arrangement or resultant undue restraint of trade. *United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919); *Bushie v. Stenocord Corp.,* 460 F.2d 116 (9th Cir. 1972); *House of Materials, Inc. v. Simplicity Pattern Co.,* 298 F.2d 867 (2d Cir. 1962); *Bay City-Abrahams Bros., Inc. v. Estee Lauder, Inc.,* 375 F.Supp. 1206 (S.D.N.Y.1974). Thus, even were a conspiracy found to exist, plaintiffs must fail unless the requisite unreasonable restraint of trade resulted therefrom.

merged in 1974, Albemarle was clearly designated as a Hoerner Waldorf subsidiary on its letterhead and invoices. The Hoerner Waldorf 1969 Annual Report announced to the trade the consolidation of the Mill Division and the Albemarle Mill into one sales and marketing staff. Even Irving Jacklin, plaintiffs' president, admitted that after the acquisition he treated Albemarle and Hoerner Waldorf as a single entity. (Jacklin dep. at 304–05, November 6, 1974).

At this late stage of the proceedings in the face of a summary judgment motion, plaintiffs cannot rest merely on the separate corporate status of the defendants to sustain their claim. Since plaintiffs have failed to raise any triable issues as to the relationship between defendants, summary judgment is granted on this issue. *See Sulmeyer v. Seven Up Co.,* 411 F.Supp. 635 (S.D.N.Y.1976).

■ Defendants have met plaintiffs' claim of a third-party conspiracy with a flat denial that anyone else was involved in the decision to sever supply relations with plaintiffs. Undaunted by this denial, plaintiffs assert that Dillard Paper Company and Trinity Bag and Paper Company, two customers of defendants who were also competitors of plaintiffs, consorted with defendants to fix market conditions and prices by arbitrarily choosing which customers to supply and which to eliminate. Plaintiffs have submitted a letter from Larry Norton dated November 7, 1974 notifying plaintiffs of the cessation of their supply relationship, which, after describing the quality and credit disagreements between the parties, states that "because Hoerner Waldorf mill division is commodity oriented and sells almost exclusively to 100% converters, who will shut down their business if they cannot get paper, we should take care of these people first." (Pl. Ex. P). Plaintiffs claim that notwithstanding this statement, Dillard and Trinity, who were not 100% converters and who had other sources of sup-

ply, continued to be supplied by defendants, who decreased sales to Dillard by a mere 5% while increasing sales to Trinity. This resulted, according to plaintiffs, in Dillard's ability to supply customers that plaintiffs lost as a result of its elimination from the market. Plaintiffs additionally assert that the fact that Hoerner Waldorf concededly raised its prices to Dillard by April 1974, evidenced some type of reward for granting Dillard, by the elimination of plaintiffs as competition, a distinct competitive advantage in the market.

Whether plaintiffs can sustain their position at trial is arguable; however, for the purposes of this motion I am constrained to find a triable issue of fact as to whether such conspiracy existed and, if so, whether its ends were anticompetitive in nature.

## MONOPOLIZATION

It is apparently plaintiffs' contention that defendants' refusal to deal with them, whether by conspiracy or unilateral act, constituted a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2,[5] since it was motivated by a monopolistic purpose. *See Industrial Bldg. Materials, Inc. v. Interchemical Corp.,* 437 F.2d 1336 (9th Cir. 1970), *cf. United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). Defendants counter this contention by asserting that, as a matter of law, based on the allegations and proof offered by plaintiffs, findings of monopolization or attempt or conspiracy to monopolize are untenable.

■ To the extent that Hoerner Waldorf is alleged to be a monopolist, summary judgment in favor of defendants must be granted. Accepting plaintiffs' allegations as true, the 14% share allegedly held by Hoerner Waldorf is totally insufficient to support a finding of monopolization. *White Bag v. International Paper Co.,* 1974–2 CCH Trade Ca. ¶ 75,188 (4th Cir. 1974); *Hiland*

5. Section 2 of the Sherman Act, 15 U.S.C. § 2, in relevant part, imposes civil and criminal sanctions on "every person who shall monopolize, or attempt to monopolize or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations . . . ."

*Dairy, Inc. v. Kroger Co.,* 402 F.2d 968, 974 and cases cited therein (8th Cir. 1968).

Likewise, the claim of attempted monopolization is insubstantial as a matter of law. For plaintiffs to succeed on this claim, they must prove both a specific intent to monopolize and a dangerous probability of success. *FLM Collision Parts, Inc. v. Ford Motor Co.,* 543 F.2d 1019, 1030 (2d Cir. 1976); *Bowen v. New York News,* 366 F.Supp. 651, 673–77 (S.D.N.Y.1973), *aff'd in part and rev'd in part,* 522 F.2d 1242 (2d Cir. 1975). Taking plaintiffs' allegations as true, they have not only failed to evidence this latter element, but have succeeded in demonstrating that no such probability exists.

The burden is on plaintiffs to come forward to demonstrate that Hoerner Waldorf has a sufficiently high share of a relevant market to create a dangerous probability that the intended monopolization will succeed. Thus, proof of the relevant product and geographic markets is essential. *FLM Collision Parts, Inc. v. Ford Motor Co., supra; Bowen v. New York News, supra.* After two and one-half years of discovery, all that plaintiffs have come forward with on the issue is a conclusory affidavit of an economist asserting that Hoerner Waldorf has a 14% share of a relevant product market consisting of "packaging materials derived from forest products, more specifically, that which is composed of paper." And despite the fact that plaintiffs appear to focus their allegations of anti-competitiveness on "the southern tier of about eight or nine states" where Dillard does business, no relevant geographic market is detailed, and only nationwide sales figures are given. Moreover, plaintiffs concede that seven other major companies share the field, notwithstanding allegations that Hoerner Waldorf is the second largest in terms of sales. How Hoerner Waldorf's refusal to deal with plaintiffs, allegedly cutting plaintiffs out of the Kraft paper market only, could possibly evince a purpose of imminent accomplishment of domination in a market which includes "all packaging materials," of which Hoerner Waldorf has a minor share and a substantial number of competitors, is open to conjecture. Suffice it to say, none of plaintiffs' proof could warrant a finding of "dangerous probability" of monopolization and summary judgment on the issue is granted.

While attempted monopolization requires conduct imminently threatening monopolization, such is not the case with a claim of conspiracy to monopolize. Market power is not an essential element; all that is necessary is a specific intent to monopolize. *United States v. Consolidated Laundries Corp.,* 291 F.2d 563, 573 (2d Cir. 1961). A violation is made out if any appreciable part of interstate commerce is the subject of the conspiracy. *United States v. Yellow Cab Co., supra,* 332 U.S. at 225–26, 67 S.Ct. 1560; *United States v. Consolidated Laundries Corp., supra.* Plaintiffs have submitted proof indicating that Hoerner Waldorf has expanded considerably in size by acquisition and has enlarged its sales volume substantially. It has also attempted to show that, in concert with Dillard, Hoerner Waldorf has, by cutting out plaintiffs, strengthened Dillard's position in the Southeast and then raised the prices of Kraft paper sold to Dillard. Defendants assert that the refusal to deal with plaintiffs was prompted by legitimate business purposes, and not by any conspiracy to monopolize the market. The motivation behind this decision is an issue of fact which precludes summary judgment on this issue.

Defendants' motion for partial summary judgment is granted as to the issues of exclusive dealing under § 3 of the Clayton Act, inter-enterprise conspiracy under § 1 of the Sherman Act, and monopolization and attempted monopolization under § 2 of the Sherman Act; it is denied as to the issues of third party conspiracy to restrain trade under § 1 of the Sherman Act, and conspiracy to monopolize under § 2 thereof.

Settle Judgment on seven days' notice.