SOLVEX CORPORATION, Plaintiff, Counter-Defendant,

v.

Howard I. FREEMAN et al., Defendant, Counter-Claimant.

Civ. A. No. 73–C–11–H.

United States District Court, W. D. Virginia.

Nov. 9, 1977.

**442**

Bruce D. Rasmussen, Edward B. Lowry, Michie, Hamlett, Donato & Lowry, Charlottesville, Va., for plaintiff.

Donald H. Balleisen, Greenebaum, Doll, Matthews & Boone, Louisville, Ky., E. Arthur Thompson, Paul & Paul, Philadelphia, Pa., for defendant.

## OPINION

TURK, Chief Judge.

This action for patent infringement was filed by plaintiff Solvex Corporation (hereinafter referred to as Solvex) against Howard I. Freeman, Modern Mono, Inc. and Monofilaments, Inc. (hereinafter referred to as Monofilaments) on April 24, 1973. Modern Mono, Inc. is a wholly owned subsidiary of Monofilaments. Mr. Freeman is president of both corporations. Solvex alleged that the defendants contributorily infringed and induced others to infringe two patents, U.S. Patent No. 3,311,928 (the Werth-King patent), and U.S. Patent No. 3,373,471 (the Myers patent). Monofilaments answered, and by its original and amended answers denied the allegations of infringement, asserted the affirmative defenses of fraud on the Patent Office, invalidity of the patent for failure to meet the statutory bars of the Patent Act, 35 U.S.C. §§ 102, 103, and patent misuse. Monofilaments also counterclaimed, alleging that Solvex violated the Sherman Act, 15 U.S.C. §§ 1 and 2, and the Clayton Act, 15 U.S.C. §§ 15 and 22 by knowingly and unlawfully monopolizing, attempting to monopolize, and combining and conspiring with others to monopolize trade in polycarbonate thread sold to the men's clothing industry, and by knowingly and unlawfully combining, conspiring and agreeing to restrain part of the trade in polycarbonate thread sold to the men's clothing industry among the several states. Monofilaments joined Fibrex Corporation, Homer Myers, Walter King, and Solvex Sales Corporation as counter-defendants.

Solvex is the assignee of the Werth-King and the Myers patents which are process patents for the removal of basting thread. The process is used exclusively in the men's clothing industry. The former patent entitled "Process of Basting and Removal of Basting," claims a process of treating a garment in which is sewn a plastic basting thread soluble in dry cleaning solvent with immersion of the garment in dry cleaning solvent to dissolve the thread and simultaneously dry clean the garment, and the process in the manufacture of a garment of basting the garment with the plastic thread and dry cleaning the garment to dissolve the thread after completion of the garment. The Myers patent entitled "Method For Removing Temporarily Emplaced Threads From Fabric Material," claims a process of removing a polycarbonate basting thread by treating the garment with perchlorethylene dry cleaning solution. The patent teaches

that the thread will fracture and fall out of the garment upon agitation.

Fibrex Corporation, several of the shareholders of which overlap with Solvex, manufactures a polycarbonate thread used in the two processes. Fibrex and Solvex entered into a "Patent License and Royalty Agreement" in 1968 pursuant to which Fibrex was granted a non-exclusive license to manufacture and sell basting thread for use in the patent processes in consideration of a 10% royalty based on the sales price of the thread. Solvex Sales Corporation was the exclusive distributor of the thread manufactured by Fibrex. The facts regarding the invention, patent applications and description of the corporate entities are more fully described in the Memorandum Opinion of this court dated July 26, 1976.

Until 1970 the only method of patent licensing available was by purchasing the unpatented polycarbonate thread from Solvex Sales.[1] In 1969, Howard Freeman, President of Monofilaments, a thread manufacturer which also manufactures a polycarbonate thread, sought Federal Trade Commission intervention against Solvex for patent misuse. The Division of General Trade Restraints by letter informed Solvex that its licensing practices appeared to be an illegal extension of the patents. The matter was resolved through informal negotiation and Solvex agreed to revise its licensing arrangements. Solvex thereafter instituted a new patent licensing system by which the processes could be used with a thread purchased from manufacturers other than Fibrex. A customer who purchased from Solvex Sales thread manufactured by Fibrex received an implied license to use the thread in the patented process. The royalty was included in the purchase price and a portion of the royalty retained by Solvex Sales.

A customer who purchased thread from a source other than Solvex Sales paid a royalty directly to Solvex. Solvex then paid a royalty portion to Solvex Sales. These lat-

ter licensees were required to keep records of their thread purchases, retain the records for three years and allow Solvex the right to audit these records. Solvex also required that any improvements in the patents developed by the licensee had to be submitted to, and become the property of, Solvex. These agreements form the basis for Monofilaments' allegations of continued patent misuse and antitrust violations.

On April 26, 1976, this court entered an order dismissing counterdefendants Homer Myers, Walter King, Fibrex Corporation, and Solvex Sales for lack of personal jurisdiction. This order was later vacated on July 26, 1976, as to the extent of the defendants' counterclaim against Fibrex and Solvex Sales. However, by stipulation of the parties the court dismissed Solvex Sales without prejudice according to the terms of the court-approved stipulation dated April 27, 1977.

The court also entered an order granting Monofilaments' motion for summary judgment as to that part of the complaint alleging infringement by defendants of the Myers patent on the ground that the patent was unenforceable for failure to meet the requirements of 35 U.S.C. §§ 102(f) and (g). However, notwithstanding this order the court later ordered that all issues of patent validity be argued and submitted to the jury. That judgment as to the validity of the Myers patent is now reaffirmed. Trial was to a jury in Charlottesville, Virginia, in May, 1977. At the conclusion of the evidence, the court directed a verdict for defendants on the issue of patent misuse prior to July, 1970. The several remaining issues were submitted to the jury in special verdict form which consisted of 32 questions. The jury returned its verdict on June 4, 1977, which was received and ordered filed. The parties were given until June 27, 1977, to file post verdict motions, which motions have been received by the court. A certified copy of the jury verdict is appended to this opinion.

---

1. The agreements among the entities are described in the Memorandum Opinion of this court dated April 26, 1976.

The jury found against Solvex on almost every issue of fraud, inequitable conduct, patent misuse, failure to meet the statutory bars, and antitrust violations. The jury also found that Monofilaments had infringed the patents. However, the jury awarded damages of one dollar for infringement, and one dollar to Monofilaments on the antitrust counter-claim.

Monofilaments, Modern Mono, and Howard I. Freeman, the defendants and counter-claimants have moved the court for a new trial on the issue of antitrust damages, and have also moved the court for costs and attorney's fees in defense of the patent infringement suit pursuant to 35 U.S.C. § 285, for treble its expenses and attorney's fees in defense of the patent infringement suit as antitrust damages pursuant to 15 U.S.C. § 15, and for reasonable attorney's fees and costs expended in prosecution of the antitrust counter-claim pursuant to 15 U.S.C. § 15.

Solvex has moved this court for judgment n. o. v. or in the alternative for a new trial.

Solvex's motions are based on alleged errors in the court's charge to the jury, in its evidentiary rulings at trial, and on alleged serious inconsistencies in the jury verdict and lack of evidence to support certain jury findings.

1) Errors in charge to the Jury.

Solvex first argues that in regard to Question Nine, the court should have charged the jury as to the subject matter that constituted the relevant prior art for the determination of obviousness. Solvex had requested a charge that the relevant prior art was that of apparel or the men's clothing industry. Monofilaments had presented evidence that the relevant art was the field of chemistry. The question presented to the jury, and the instructions as to obviousness which were given were substantially those approved by the Fourth Circuit in *Tights, Inc. v. Acme-McCrary Corp.*, 541 F.2d 1047, 1061 (1976). Although the ultimate question of obviousness is a question of law, the basic inquiry as to the scope and content of the prior art is one of fact, *Graham v. John Deere*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1965); *Tights, Inc., supra*. The jury was instructed as to the factual findings it must first make in order to make the finding of obviousness. The jury is not required to make the detailed findings of fact that the court would have made had the case been tried to the court, *Tights, Inc., supra*, at 1061. It was not error to present the interrogatory as a mixed question of fact and law, *Tights, supra*. Both parties presented evidence to the jury at the trial as to the proper delineation of the scope of the prior art, and there was sufficient evidence to support the jury's finding.

Questions ten and nineteen asked the jury to find whether the specifications of each patent were inadequate to allow successful use of its teachings. The jury so found as to the Myers patent only. Solvex alleges as error the fact that the court should have either directed a finding that the descriptions were adequate, or charged the jury that there must have been evidence that the inventions could not be practiced. There was sufficient evidence presented that the specification of the Myers patent which taught that the thread should be elongated was in fact untrue and that elongation of the thread actually retarded the fracturing process. The specification failed to describe the best method contemplated to carry out the invention so as to enable a person skilled in the art to use the process, *Indiana General Corp. v. Krystinel Corp.*, 297 F.Supp. 427, 447 (S.D. N.Y.1969), *aff'd* 421 F.2d 1032 (2d Cir. 1970), *cert. denied* 398 U.S. 928, 90 S.Ct. 1820, 26 L.Ed.2d 91 (1970). The jury obviously understood this testimony and its relevance to Question Nineteen since it answered the same question differently in regard to the Werth-King Patent.

Questions Seven, Eight, Eight(a), and Fifteen, Sixteen, and Seventeen required the jury to determine the issues of fraudulent procurement of the patents and inequitable conduct. Solvex contends that it was error for the court not to specifically

define the term fraud and not to instruct the jury specifically on materiality. These interrogatories themselves did not contain the term fraud and a charge using that term itself was not necessary. When taken as a whole, the instructions for the six questions, and the language of the questions themselves, contained the information required to be conveyed to the jury, so that failure to specifically define the term materiality was not prejudicial error. Again, the jury was able to evaluate the evidence and distinguish among questions, as shown by its "no" answer to the question of intentionally withholding material information from the Patent Office in the prosecution of the Werth-King Patent (Question 7) and "yes" answers to the questions of intentionally making material false statements and engaging in inequitable conduct in the prosecution of that patent (Questions 8 and 8a), and its answers to the same questions in regard to the Myers patent. Moreover, there is adequate evidence supporting the "no" answer to Question 7, as indeed there is in regard to the other questions to indicate that the jury did not speculate as to these questions.

■ Moreover, it was unnecessary to charge the jury, as Solvex argues should have been done, that the good faith of a patent applicant and his attorneys in their prosecution before the Patent Office is a complete defense to a charge of fraudulent conduct necessary to support the antitrust counterclaim. Where the jury has found intentionally misleading conduct as to both patents as well as inequitable conduct, it has found bad faith.

Solvex next argues that the instructions to the jury in regard to the issues of patent misuse were inconsistent and contained errors of law so as to require a new trial. Solvex's primary argument is that the court's charge to the jury was based on the view gained from *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), that all vertical restrictions between Solvex, Fibrex, and Solvex Sales were illegal. That case has been recently overruled by *Continental T.*

*V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977).

The gist of the question propounded to the jury (Question 20), and of the instructions clearly involved the tying issue. Monofilaments alleged that Solvex's post-1970 licensing arrangements, whereby those who purchased the unpatented thread from sources other than Solvex Sales could obtain a process license constituted illegal tying and therefore patent misuse. Question 20 presented several theories on this issue to the jury. *Continental T. V., Inc., supra*, does not invalidate the questions presented.

■ Although the court included an instruction as to vertical territorial restrictions, to which issue *Continental T. V., Inc.* would be applicable, the jury was not given a question regarding territorial restrictions. Moreover, since the jury found misuse on every issue presented, inclusion of the one sentence regarding territorial restrictions, if error, was harmless.

■ Solvex also disputes the instruction that a patentee must offer its licenses on equivalent terms whether or not the user of a patented process purchased the unpatented product from the patent owner or designated third party or from a competitor. It argues that the court's instruction would require compulsory licensing and is contrary to law, citing *Bela Seating Co. v. Poloron Products*, 297 F.Supp. 489 (N.D.Ill.1968), that a patent owner is not required to grant licenses to all comers at equal rates and terms. That opinion later states, "an owner of a patent may grant licenses to manufacture, use or sell upon conditions not inconsistent with the scope of the monopoly," *Bela Seating, supra*, at 509. The issue which the court's instruction addressed was whether Solvex was acting within the scope of its monopoly regarding licensing arrangements involving the purchase of an unpatented product. The court correctly instructed on the issue as to whether a patentee is required to license everyone on identical terms where that was the issue to be addressed. (Transcript at 36).

■ Solvex next contests the instruction regarding package patent licensing at pages 36 and 40. The instructions presented a question of fact to the jury as to whether Solvex's licensing agreements with clothing manufacturers were so written as to obligate the latter to pay royalties after the expiration of a patent. Here again the question as to package patents was not presented to the jury, and any inconsistency which Solvex alleges would have been harmless error.

■ The third contradictory instructions objected to by Solvex involve price fixing and royalty sharing. Conceding that the overall instruction on pages 35–36 regarding royalty sharing with a third party was correct, Solvex objects to the use of the term "kickback" on page 59 in the instruction regarding the issue of price-fixing. The inadvertent use of one word in instructions requiring 81 pages of transcript could not have been prejudicial, and taken with the other antitrust violations found by the jury, in fact was not so.

■ Solvex contends that the instruction that Fibrex and Solvex Corporations were presumed to be separate entities was error. This instruction (page 53) was given in regard to Monofilaments' counterclaim alleging violation of § 1 of the Sherman Act. Solvex argues that intracorporate conspiracies are limited to horizontal activity and may be applied to vertical activity only when the corporations are competitors. The law cited by Solvex is applicable to parent and subsidiary corporations. However, Solvex and Fibrex were not parent and subsidiary corporations, but corporations with some mutual stockholders. If Solvex now claims that although separate entities, the Corporations functioned essentially as a single business unit, *Giant Paper and Film Corp. v. Albemarle Paper Co.*, 430 F.Supp. 981, 985 (S.D.N.Y.1977), it offered no evidence as to that issue at trial. Nor was any evidence offered that the arrangements among Solvex, Solvex Sales and Fibrex had elements of a franchise and trademark licensing arrangement. Solvex now offers this argument to dispute the court's

instruction that price fixing is a per se violation of the Sherman Act, stating that such franchise and trademark arrangements were held to be not subject to per se treatment. Since no evidence as to these issues was introduced, the issue could not go to the jury.

■ Solvex next argues that the court should have directed a verdict that Solvex did not monopolize in violation of the Sherman Act, or at least have charged that the absence of the ability to control the price or restrict competitors was an indication of lack of monopoly power. In light of the instruction that monopoly power requires the ability to control prices, the converse was obvious. There was sufficient evidence presented as to monopoly power to go to the jury and withstand a directed verdict as to that issue.

2) Errors in Trial Rulings.

■ Solvex first claims that the court erred in not granting its motion for mistrial after opening arguments on the grounds that Monofilaments then indicated for the first time it would charge William E. Sherwood, Solvex's patent attorney, with fraud. Solvex alleges that Monofilaments' change in position was a surprise and was prejudicial to Solvex.

This case has been in litigation since 1973. Mr. Sherwood's deposition was taken in 1975. The parties have filed numerous memoranda in support of and opposition to motions for summary judgment. The issues of fraud have been thoroughly briefed. Solvex was well aware of the nature and extent of these issues, and had ample time to inform Mr. Sherwood as to questioning he should expect at trial. Solvex's attorneys do not represent Mr. Sherwood; there was no issue of a conflict in the attorneys' duties toward their clients. If Mr. Sherwood should have been represented by counsel of his own there was enough time for him to obtain representation. The court perceived no prejudice during the proceedings toward Solvex and given the length of the time period during which the fraud

issues were briefed, there could have been no surprise.

■ Solvex next contends that it was prejudiced by the jury inspection of the Monofilaments plant. The jury took a rapid tour of the Monofilaments thread manufacturing facilities. The trip was educational in that the jury received a first hand view of the technical aspects of the manufacturing process that was described in court. Solvex fails to specify as to how the trip was prejudicial and the court perceived no prejudice attaching.

■ Solvex's final citation of error is that the court allowed Professor David Croll from the University of Virginia to testify regarding accounting principles. Professor Croll was not on the supplied witness list and was brought in hurriedly to testify as to commonly accepted accounting procedures after Monofilaments witnesses had explained the procedures used in calculating its damages. Solvex had economic experts on hand at the trial and had adequate advance notice of the Monofilaments calculations. It was not without the means by which to cross-examine the witness. Since the jury did not accept Monofilaments' damage calculations, Solvex was not prejudiced.

3) Inconsistencies and Errors in the Jury Verdict.

■ Solvex alleges that the answers to Interrogatories 7 and 8 are inconsistent in that the jury found that Solvex had not withheld material information from the Patent Office, yet in Interrogatory 8 the jury stated that Solvex failed to make full disclosure. However, Interrogatory 8 also asked whether Solvex was guilty of inequitable conduct in dealing with the Patent Examiner. The jury could reasonably have found inequitable conduct on the part of Solvex, especially since it also found that Solvex intentionally made material false statements in the prosecution of the Werth-King patent (Question 8A). A further difference between Interrogatory 7 and 8 is

that the latter question did not require a finding of materiality as to the disclosure. This question was directed at conduct which was less than fraud.

Solvex argues that the jury was inconsistent in its answers to Interrogatories 11 and 15. The jury found that in the prosecution of the Myers Patent the best prior art was considered by the Patent Office (Q.11), and also that Solvex, in prosecuting the Myers patent, intentionally withheld from the Patent Examiner information which was material to the patent application. Solvex argues that the only material information in evidence regarding this question was the earlier work done by Peter Werth with perchloroethylene and polycarbonate thread. Yet the jury also found that the Patent Examiner who had not been informed of this work had considered the best prior art. The parties presented evidence of several patents which had been cited to the Patent Office. The jury must have believed that prior art only included work in printed publications or earlier patents and therefore found that the proper printed sources had been before the Patent Office. But this misunderstanding of prior art does not alter the fact that the jury found that Solvex had intentionally withheld from the Patent Office information as to Peter Werth's earlier work and conversations about that work with Homer Myers.

Solvex also argues that several of the findings of the jury lacked factual support. The court finds no merit in any of these contentions. Both parties put on extensive testimony as to these issues; it was the province of the jury to resolve the conflicts in the evidence. The findings that Solvex alleges were without factual support will be briefly discussed.[2]

The jury found (Question 5) that the Patent Office did not consider the best prior art in the prosecution of the Werth-King patent. The prior art at issue here was the Donaldson patent. The court instructed that if a patent was in a classification that the Patent Examiner searched then it was presumed to have been considered by the

2. The court does not have available to it a transcript of the trial proceedings at this time.

Patent Office (Transcript at 81); this was a rebuttable presumption. There was adequate evidence presented by witnesses familiar with the Patent Office as to the Patent Office's classification system, and record keeping to support the jury's finding.

The jury found (Question 8a) that Solvex made false material statements to the Patent Office. There was evidence that Solvex, in an attempt to overcome the Patent Office's initial rejection, offered to supply affidavits from the industry as to the usefulness of the Werth-King patent at a time when those affidavits could not have been supplied. This evidence was sufficient to support the jury's finding.

The jury found (Question 9) that the Werth-King patent was obvious. The jury heard testimony from Walter King as to the origins of his idea, from the research staff at Spindletop Research that put the ideas into effect and from Donaldson that would support its findings.

The jury found that Homer Myers was not the true inventor of the process claimed in the Myers patent (Question 12) and that the Myers process was not novel and useful (Question 3). Here again, the testimony from Peter Werth and from Homer Myers as to Werth's prior work with the process described in the patent was sufficient to show that Myers merely described why the process worked (i. e. by fracturing instead of dissolving) rather than invent a patentable process himself.

The jury found that the Myers process was in public use in this country more than one year prior to the date of the patent application (Question 14). The evidence showed that the coats on which the process had been tested more than a year before the patent application had been put in inventory at Curlee Clothing Company and sold. The jury could have found "public use" from this evidence.

The jury found that Solvex intentionally made false statements of material facts in the prosecution of the Myers patent (Question 17). There was sufficient evidence here also to support such a finding, including evidence of statements of elongation of the thread to enhance its fracturing properties, and statements that Homer Myers was the inventor of the process.

The jury found that the Myers process was obvious (Question 18). Solvex contends nonobviousness to one skilled in the men's clothing industry. The jury could have found the Myers process obvious in light of the previous patents, or in light of the published evidence introduced regarding the properties of polycarbonate.

The jury found that Monofilaments did not continue to infringe or contributorily infringe the patents after February 1, 1973, the date of withdrawal of its hold harmless letter to its customers (Question 25). Solvex argues that the evidence was clear that Monofilaments engaged in contributory infringement by continuing to sell polycarbonate thread after that date with the intention that it be used in the patented processes. However, the jury need not have found that Monofilaments knew that its customers were infringing. Moreover, since the jury found that Solvex was misusing its patents throughout that time, Solvex could not enforce the patent against an imputed infringement.

■ In sum, the court finds that the jury's findings are supported by the weight of the evidence. The only confusion shown by the jury, and not cited by Solvex, is in the finding that Solvex was entitled to $1.00 damages for infringement of each patent (Questions 26, 27). Here apparently the jury did not read the last phrase of each question, that damages should be assessed for any period during which Solvex did not misuse the patent. Since the jury found that the patent misuse had continued and the effects were not eliminated, (Question 21), Solvex should not have been awarded any damages for infringement.

The court finds that there was substantial evidence to submit the case to the jury, and that the jury's verdict was neither against the weight of the evidence nor represents a miscarriage of justice. Accordingly, Solvex's motions for judgment n. o. v. and for a new trial are denied.

Monofilaments has moved this court for a new trial solely on the issue of antitrust damages. It bases this motion on the fact that the jury found that Monofilaments had been damaged as a result of Solvex's antitrust violations (Question 30), yet then found that the amount of damages sustained by Monofilaments was one dollar. The jury then appended to its special verdict form the statement that "it is the hope of the jury that as a result of this verdict both parties concerned will have equal opportunity to compete in an open market. Substantial damages were not awarded to either party as the jury felt both parties were equally responsible for wrongdoings involved in this case."

Monofilaments argues that since the damages found were so inadequate, the jury applied its own theory of offset and cancelled out Monofilaments actual more substantial damages with those incurred by Solvex through Monofilaments infringement of the patents (Questions 23, 24), instead of stating a correct damage figure that Monofilaments sustained. Moreover, since Solvex's patents were found to have been invalid and misused, Solvex could not enforce them against Monofilaments by collecting damages. For the jury to offset Solvex's and Monofilaments' damages was contrary to law.

 Pursuant to Rule 59, a judge may in his discretion, grant a new trial as to all or part of the issues to prevent injustice. Partial new trials solely on the issue of insufficient damages can be awarded in this circuit where the amount awarded evinces prejudice, partiality or corruption, or a mistaken view of the merits of the case by the jury, *DeFoe v. Duhl*, 286 F.2d 205, 207 (4th Cir. 1961).

 However, the court finds that this verdict is consistent on its face, is supported by the weight of the evidence, and may not be impeached by the statement of one juror appended to the end. Although the jury found that Monofilaments was damaged by Solvex's antitrust violations, nowhere in the verdict did the jury find Monofilaments suffered "substantial damages" as Monofila-

ments now claims. It was within the province of the jury to completely reject Monofilaments' evidence as to damages as being theoretical, conjectural or speculative, and to find that Monofilaments had in fact been only nominally damaged by Solvex. Solvex had presented evidence as to business reasons for Monofilaments' failure to more substantially penetrate the polycarbonate thread market, such as the latter's later entry into that market, and the jury could have believed that evidence. If this were so, the verdict was not inconsistent as to be based on misconceptions of the law or be the result of a setoff. Under that view of the evidence, the verdict was consistent on its face.

 The statement by the jury foreperson was not part of the verdict. A juror may not impeach his own verdict, *McDonald v. Pless*, 238 U.S. 264, 267, 35 S.Ct. 783, 59 L.Ed. 1300 (1915). A juror may not testify about the influence and effect of anything upon any juror's mind or about his mental processes in connection with the verdict, 11 Wright & Miller, *Federal Practice and Procedure*, Civil § 2810 at 72 (1973), and efforts by a jury to show what is meant by answers to a special verdict are of no value. *Smith-Blair, Inc. v. R. H. Baker & Co.*, 232 F.Supp. 484, 487 (S.D.Calif.1962), *aff'd* 331 F.2d 506 (9th Cir. 1964).

Monofilaments motion for a new trial on the issue of antitrust damages is therefore denied.

Defendants have also moved the court for reasonable attorney's fees incurred in their successful defense against the patent infringement suit brought by Solvex. 35 U.S.C. § 285 provides that "the court in exceptional cases may award reasonable attorney fees to the prevailing party." Defendants have submitted a summary and breakdown of fees and costs which, for patent issues alone, included $123,557.35 for attorney fees, $11,320.78 for costs, and $34,-905.43 for experts fees, totaling $169,783.56.

Fraudulent procurement of a patent has been held to constitute an exceptional case within § 285, *see, e. g., Monolith Portland*

*Midwest Co. v. Kaiser Aluminum & Chemical Corp.*, 407 F.2d 288, 294 (9th Cir. 1969). The Fourth Circuit in *Dubuit v. Harwell Enterprises, Inc.*, 540 F.2d 690, 694 (4th Cir. 1976), has recently quoted approvingly from *Hoge Warren Zimmerman Co. v. Nourse & Co.*, 293 F.2d 779, 784 (6th Cir. 1961) that "exceptional circumstances have been interpreted as incorporating concepts of fraud, malice, bad faith and other similar concepts," and from *Purer & Co. v. Aktiebolaget Addo*, 410 F.2d 871, 880 (9th Cir. 1969) that an allowance of attorney fees "should be based upon a finding of unfairness or bad faith in the conduct of the losing party, or some other equitable consideration of equal force, which makes it grossly unjust that the prevailing party be left to bear the burden of his own counsel fees." In an earlier opinion, the Fourth Circuit denied attorney's fees where there was "no showing of unconscionable conduct or bad faith or any other circumstances which might make such an award proper," *Carolina Lee Knitting Co. v. Johnson & Johnson*, 275 F.2d 91 (1960).

 While this court does not find that Solvex's litigation was necessarily unjustified, *Dubuit, supra*, see below, it does find that the jury's findings were of such force as to make it unjust for Monofilaments to bear the entire burden of its litigation fees. The jury found fraudulent conduct by the plaintiff in the procurement of each patent. In regard to the Werth-King Patent, the jury found that Solvex failed to make full disclosure to the patent examiner or was guilty of inequitable conduct in dealing with the examiner, and intentionally made material false statements in the prosecution of the Werth-King Patent. The jury also found that Solvex intentionally withheld from the patent examiner information which was material to the Myers application, failed to make full disclosure to the patent examiner, was guilty of inequitable conduct in its dealings with the examiner, and intentionally made false statements of material fact to the Patent Office in its prosecution of the Myers Patent.

When these findings of fraud are coupled with the jury's findings of patent misuse on every issue submitted, it is appropriate to compel the patentee to absorb a reasonable part of the expenses incurred by its adversary, *Dubuit supra* at 694, and to award the patent defendant's fees pursuant to § 285.

Monofilaments has submitted exhibits constituting its attorneys and experts fees and its costs and divided these amounts as to the patent and antitrust litigation. Fees and costs allocated to the patent case total $169,783.56. Of this amount, $107,700.00 is attorney and paralegal fees for defense counsel, $6,925.00 for outside counsel, $8,932.35 for original counsel, $5,502.07 costs paid through the attorney's offices, and $34,905.43 experts fees. Much of the costs paid through Monofilaments' attorneys were expenses involved in traveling to depositions. Of the $5,502.07 costs requested $168.96 was spent for witness fees, mileage and United States Marshal's fees for depositions. The court will award the $168.96 spent for witness and Marshal's fees. The court reporters' fees of $5,818.71 are also awarded. These reporters' fees were paid for pre-trial depositions, which were extensive. The depositions taken were reasonable trial preparation in this case, several were read into evidence, and important aspects of Monofilaments case were built from information obtained through deposition. The court therefore feels it is reasonable to award witness and reporters costs for depositions. The award of attorneys expenses, however is denied.

The attorneys fees requested for the patent aspects of this case total close to the amount of damages that Solvex requested the jury award for infringement of both patents, when experts fees are added to attorneys fees, the sum exceeds that requested as damages by Solvex. Of the expert witnesses' fees, Monofilaments has allotted $34,904.43 for patent expert Irving Kayton and $5,000.00 for its expert witness economist Charles Goetz.

 Although several issues of fraud and patent misuse were relevant to both the patent infringement defense and the

antitrust counterclaim, their development would have led to greater rewards in the antitrust counterclaim. Monofilaments, however, seems to have computed the lion's share of attorney and paralegal time on those issues to the patent case. Monofilaments has divided the fees paid to outside counsel and to expert witness Goetz equally between patent and antitrust, although their court time was spent on the antitrust damage issue and all conference time with them entered on defense counsel's attorney time breakdown sheets was allocated to antitrust. The court therefore feels that it is unreasonable to award those latter fees to Monofilaments pursuant to § 285.

Expert witness Kayton testified at length on the patent issues, especially the § 102 and § 103 violations as well as background information regarding interpretation of the patent law, Patent Office procedures and reading of the patent claims. The jury found for Monofilaments on the patent issues about which he testified. The court believes that it would therefore be reasonable to award $5,000.00 toward Professor Kayton's fees.

Monofilaments has asked $107,700.00 for defense counsel fees and $8,932.35 for original counsel fees. Although Monofilaments raised and successfully presented several grounds of defense to the patent litigation, an award of that size would be unreasonable as to these parties. The court feels that, taking into account the size of the entities involved, the amount requested as damages by the plaintiff, the fact that there has been no proof that the lawsuit itself was originally brought in bad faith, and the fact that additional fees and costs are awarded for the antitrust counterclaim, the court awards $50,000.00 attorney's fees.

■ Defendants have also moved this court for treble its costs in defending the patent infringement suit. Defendants argue that these costs are its antitrust damages recoverable under 15 U.S.C. § 15, which states in part,

"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore in any district court . . . and shall recover threefold the damages by him sustained."

There is precedent in other circuits for an award as antitrust damages of treble the expenses incurred in defense of a patent infringement suit, where the patentee has violated the antitrust laws. However, in the cases cited by Monofilaments in support of its motion in which the costs of defending against a patent infringement suit have been awarded as antitrust damages, the courts have all found that the patentee had brought the patent suit as an integral part of, and in furtherance of a plan to violate the antitrust laws. *See, e. g., Clapper v. Original Tractor Cab Company,* 270 F.2d 616 (7th Cir. 1959), *cert. den.* 361 U.S. 967, 80 S.Ct. 588, 4 L.Ed.2d 547 (1960); *Acme Precision Products, Inc. v. American Alloys Corp.,* 347 F.Supp. 376 (W.D.Mo.1970), *aff'd in part, rev'd in part,* 484 F.2d 1237 (8th Cir. 1973); *Dairy Foods, Inc. v. Dairy Maid Products Corp.,* 297 F.2d 805 (7th Cir. 1961); *Kobe, Inc. v. Dempsey Pump Co.,* 198 F.2d 416 (10th Cir. 1952); *Switzer Bros., Inc. v. Locklin,* 297 F.2d 39 (7th Cir. 1961).

However, a patent infringement suit by itself, or even in combination with other suits brought by the same patentee, need not be questionable; such a suit is the usual means of enforcing a patent, without which patent rights may be useless to the patentee. The conjunction of a tying situation and patent infringement suit does not create a *per se* right to treble attorney fees, *Rex Chainbelt, Inc. v. Harco Products, Inc.,* 512 F.2d 993, 1004 (9th Cir. 1975).

There is no finding that the lawsuit itself was brought for the purpose of furthering activities unlawful under the antitrust laws rather than for the purpose of enforcing the patent. A finding that a patentee has committed an antitrust violation by the enforcement of fraudulently obtained patents (Transcript at 59), *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.,* 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), need not require a finding that the infringement suit itself was brought only to further unlawful activity. Further-

more, the jury did not find that Monofilaments had sustained any damage from the institution of the lawsuit (Tr. at 64).

This court declines to establish any rule which would automatically require an unsuccessful patentee plaintiff to be charged with both attorney fees under the Patent Act, and treble those fees under the antitrust acts wherever fraud in the procurement of a patent has been found. Therefore, Monofilaments' motion for treble its attorney fees and costs in the patent litigation is denied.

 The Clayton Act § 4, 15 U.S.C. § 15 also provides for recovery of reasonable attorney's fees and costs of suit to "any person who shall be injured in his business . . . by reason of anything forbidden in the antitrust laws . . . ." The jury found that Monofilaments had been injured by Solvex and found antitrust violations in every issue presented. Although the amount of the recovery to Monofilaments was nominal, the court feels that it would be unjust in this case for the fees and costs to be calculated by a proportion of the damage award. "Where the damages recovered are relatively small . . . it is not necessarily an abuse of discretion to grant fees exceeding the amount of single damages," *Advance Business Systems & Supply Co. v. SCM Corp.*, 415 F.2d 55, 70 (4th Cir. 1969), *cert. denied*, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970).

This litigation was time consuming and involved complex issues of law and fact. The case was ably tried to a jury in a trial that lasted approximately one month. Monofilaments' counsel did not have the benefit of any prior judgment or decree in a case brought by the government. The proceedings before the FTC were resolved informally and several trial issues concerned practices instituted since the time of the FTC intervention. Although the jury did not accept Monofilaments' damage claims it did find that Solvex had violated the antitrust laws in every aspect presented. Therefore the court feels it is appropriate to award reasonable attorney's fees and taxable costs allocated to the antitrust claims.

Accordingly, the court awards $20,000.00 to Monofilaments pursuant to 15 U.S.C. § 15.